**OWENS–CORNING FIBERGLAS CORPORATION, Appellant,**

v.

**Roy MALONE, Mary Malone, Nick Garefalos, Pat Garefalos, and Thomas Gillespie, Appellees.**

No. 01–94–00468–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 4, 1996.

Rehearing Overruled Feb. 14, 1996.

Edward Cavazos, Kevin F. Risley, Bob Ballard, Houston, for appellant.

Lawrence Madeksho, David Gunn, W. James Kronzer, Houston, for appellees.

Before HEDGES, ANDELL and TAFT, JJ.

## OPINION

HEDGES, Justice.

In this "failure to warn" products liability action, the plaintiffs sued appellant, Owens–Corning Fiberglas Corporation (OCF), and a number of other manufacturers of asbestos-containing products.[1] Ray Malone, Thomas Gillespie, and Nick Garefalos each alleged that he had an asbestos-related disease as a result of exposure to defendants' products; Mary Malone and Patricia Garefalos claimed loss of consortium as a result of their spouses' illnesses.

Before the case was submitted to the jury in the first phase of the bifurcated trial, the plaintiffs settled with all the defendants except OCF, Allied–Signal, Inc., Garlock, Inc., and Pittsburgh Corning Corporation. All the plaintiffs had claims against OCF, although they did not all have claims against the other three defendants.[2]

The jury found: that all three men had been exposed to an asbestos-containing product manufactured or sold by OCF; that OCF's product was defective [3] when it left OCF's possession, and that OCF was grossly negligent in the marketing of its product. The jury also found that the product manufactured by Pittsburgh Corning was defective but that the products made by Allied–Signal and Garlock were not defective. Pittsburgh Corning settled with the Garefalos before the second phase of the trial began. Thus, the only defendant remaining during the second phase of the trial was OCF.

During the second phase, the parties presented evidence on causation and damages. The jury found that the marketing defect of OCF's product was a producing cause of asbestos-related disease in all three men and awarded compensatory and punitive damages. The trial court found that OCF was entitled to a credit for all settlements received by the plaintiffs and reduced the compensatory damages awards accordingly. The judgment awarded compensatory damages totalling $3,030,000; additionally, all three men were awarded $500,000 apiece in punitive damages.

## Failure to warn

■ In a failure-to-warn case, the plaintiffs must establish that the dangers were reasonably foreseeable or scientifically discoverable at the time of the exposure. *Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 668 (Tex.App.—Texarkana 1991, writ denied). All manufacturers are held to the knowledge and skill of an expert. *Id.*

## Preservation of error

Eighteen of OCF's 29 points of error deal with the allegedly erroneous admission of evidence. In their brief, plaintiffs frequently assert that OCF failed to preserve error with respect to many of these evidentiary rulings, either because: (1) although counsel for another defendant objected, OCF's trial counsel did not object; or (2) OCF objected only in a motion in limine and not at trial. Before we address OCF's points of error, we address the issue of preservation of error.

1. In the early 1950s, OCF distributed the insulation material Kaylo, which was manufactured by Owens–Illinois. Kaylo contained asbestos. In 1958, OCF bought the Kaylo line, and became both the product's manufacturer and distributor. In 1966, OCF put a warning on Kaylo, reflecting that the product contained asbestos and that users of the product should take precautions. In 1972, OCF produced an asbestos-free version of Kaylo.

2. The cases were submitted to the jury as follows: Roy and Mary Malone v. OCF, Allied–Signal, and Garlock; Thomas Gillespie v. OCF; and Nick and Patricia Garefalos v. OCF and Pittsburgh Corning.

3. The jury was instructed that "marketing defect" meant

the failure to give adequate warnings of the product's dangers that were known or by the application of reasonably developed human skill and foresight should have been known, or failure to give adequate instructions to avoid such dangers, which failure rendered the product unreasonably dangerous as marketed.

The trial court required the parties to file written objections to all tendered exhibits prior to trial. On September 1, 1993, OCF filed its "Objections of Owens–Corning Fiberglas Corporation to Plaintiffs' Exhibits," which included 92 pages of single-spaced objections to hundreds of documents tendered by plaintiffs. After voir dire but before the plaintiffs began their case-in-chief, the trial court explained its procedure for ruling on objections:

> What we're going to do is I'm going to put in the record—all the exhibits are not going to be admitted into evidence. They're simply going to be told which pile will be admitted. Y'all may choose not to put any. But when the plaintiff[s] get ready to put a document in evidence, he'll [sic] pull document 52 out, tender it in evidence, then I'll just admit it and I'll put in advance of the trial Monday afternoon that all objections will be preserved and treated as having been made at the time that the document's tendered. And all documents that I'm telling you will be admitted into evidence go in the admissible pile, those objections will be overruled, treated as timely made and those documents will come in without the objections having to be reurged.

The trial court then ruled on many of the defendants' pretrial objections:

> Now let the record reflect that all of these exhibits were objected to and all of the objections to these exhibits are overruled with the exception of the authentication objection, and at the time the exhibit is tendered, I will rule on the authentication objection if it is reurged by any of the defendants. *All objections to these were filed in advance of trial on my order and all of the objections that I have overruled as to these documents do not have to be raised again at the time the document is tendered in this trial,* but those objections are preserved and there is no waiver for failing to urge those objections at the time the document is filed, with the exception of the authentication objection.

(Emphasis added.) The trial court was adamant that objections on which he had ruled were not to be reurged: "I'll make it very clear. No lawyer is allowed to repeat their

[sic] objections. The court has preruled on everything but authentication."

The trial court also required that an objection made by one defendant would be made on behalf of all defendants:

> The Court: Mr. Tolin, put on the record what we talked about earlier about the objection of one is applicable to all.

> Mr. Tolin: Your Honor, on behalf of all defendants, throughout the course of trial an objection made by one defendant will inure to the benefit of all defendants and be considered to have been made on behalf of all defendants. That would include evidentiary objections from this point through all types of objections.

> The Court: I'll allow that in this case.

We disagree with plaintiffs' contention that "OCF's attempt to rely on the objections made by others should be rejected." It is true that in trials involving multiple defendants, a party must make its own objection to the evidence if it wishes to preserve error for appeal. *Celotex Corp. v. Tate,* 797 S.W.2d 197, 202 (Tex.App.—Corpus Christi 1990, no writ). However, in this case, the trial court apparently required and the defendants agreed that an objection made by one defendant would be considered as having been made on behalf of all defendants. Plaintiffs did not object to this arrangement.

In *Celotex,* the trial court granted the defendants' request that one defendant's objection would preserve error for all defendants. 797 S.W.2d at 201. The court of appeals found the trial court's action proper:

> Under TEX.R.CIV.EVID. 611(a)(2), a trial court is given the authority to exercise reasonable control over the presentation of evidence at trial, so as to avoid the needless consumption of time. We find that by exercising its discretion under Rule 611, a trial court may properly grant such a request.

> Without exception from appellees, the trial court expressly ruled that one objection preserved error for all. Armed with this pretrial ruling, Celotex is free to rely on any defendant's objection, just as if it was its own.

*Id.* at 201–02. For the same reasons, OCF may rely on any objection made by any defendant.

■ We further disagree with plaintiffs' assertion that OCF's pretrial objections were a motion in limine. A motion in limine merely precludes reference to the subject of the motion without first obtaining a ruling on the admissibility of those matters outside the presence of the jury. *CLS Assoc., Ltd. v. A— B—*, 762 S.W.2d 221, 224 (Tex.App.—Dallas 1988, no writ). A ruling on a motion in limine preserves nothing for appellate review. *See Glenn v. Kinco Crane, Inc.*, 836 S.W.2d 646, 648 (Tex.App.—Houston [1st Dist.] 1992, no writ). The document filed by OCF was not a motion in limine; it was a list of objections to plaintiff's exhibits that had been filed pursuant to an order of the trial court.

A trial court has the authority to make a pretrial ruling on the admissibility of evidence. *Reveal v. West*, 764 S.W.2d 8, 10 (Tex.App.—Houston [1st Dist.] 1988, orig. proceeding); *see also* TEX.R.CIV.EVID. 102 (one purpose of rules of evidence is to eliminate unjustifiable expense and delay); TEX.R.CIV.EVID. 103(a)(1) ("When the court hears objections to offered evidence out of the presence of the jury and rules that such evidence be admitted, such objections shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections.") It is clear from the record that the trial court ruled on the objections as it did in order to prevent long delays. We conclude that: (1) the trial court had the authority to require the parties to file pretrial written objections to all tendered exhibits and to make pretrial rulings on those objections; and (2) OCF's pretrial evidentiary objections were sufficient to preserve error. Plaintiffs' general challenges to OCF's preservation of error are thus without merit.

### Evidentiary rulings

■ OCF asserts that the trial court made a number of erroneous evidentiary rulings. The standard of review for the admission or exclusion of evidence is abuse of discretion. *Lyondell Petrochemical Co. v.*

*Fluor Daniel, Inc.*, 888 S.W.2d 547, 550 (Tex. App.—Houston [1st Dist.] 1994, writ denied). To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was erroneous and that the error was calculated to cause and probably did cause the rendition of an improper judgment. *Id.*; TEX.R.APP.P. 81(b)(1). The erroneous admission of evidence that is merely cumulative of properly admitted evidence is harmless. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989); *Keene Corp. v. Rogers*, 863 S.W.2d 168, 179 (Tex.App.—Texarkana 1993, no writ).

■ In reviewing a claim of trial court error, we determine whether (1) the claimed error was preserved for review; (2) the trial court committed error; and (3) the error was harmful. *Sims v. Brackett*, 885 S.W.2d 450, 453 (Tex.App.—Corpus Christi 1994, writ denied).

### 1. Altered OCF documents

In point of error five, OCF asserts that the trial court erred in admitting at least 129 OCF documents, photocopies of originals, that bore "extraneous markings, including underlining and other marks for emphasis." The extraneous markings about which OCF complains are underlining of certain words and sentences, vertical lines drawn beside certain passages, and asterisks drawn beside certain paragraphs. All the marks are black. It is not clear whether the markings were made by the plaintiffs, by the author or original recipient of the document, or by someone else; at least some of the marks appear to have been made on the original while in the possession of OCF, and reproduced on the copy.

At trial and on appeal, OCF contends that because the markings constitute an alteration of those documents, they are therefore not true and correct copies of the originals. OCF further argues the documents are not duplicates, as that word is defined by the rules of evidence, because they are not true and correct copies. OCF asserts that it was unfair to allow plaintiffs to use these altered documents.

We first determine whether the documents are duplicates of the originals. We reject OCF's assertion that because of the marks, the exhibits were not "duplicates."

A "duplicate" is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduce the original.

TEX.R.CIV.EVID. 1001(4). The documents about which OCF complains are photocopies.[4] OCF does not assert that the photocopies do not accurately reproduce the originals; instead, it complains about marks made on duplicates after reproduction. We conclude that the photocopies were "duplicates" for purposes of rule 1001(4). Those marks that were not made while the document was in the possession of OCF were marks made on duplicates.

A duplicate is admissible to the same extent as an original unless there is a question regarding the authenticity of the original or, under the circumstances, it would be unfair to admit the duplicate in lieu of the original. TEX.R.CIV.EVID. 1003. OCF does not question the authenticity of the originals. OCF asserts, without citation to any authority other than rule 1003, that it was unfair to allow the plaintiffs to use altered documents instead of true and correct copies of the originals.

As noted, it is impossible to determine whether the markings on the documents were placed on the documents by the plaintiffs, by the author or original recipient of the document, or by someone else. However, we have reviewed the documents carefully and we agree with the plaintiffs that the markings on the documents are not significant. Rule 1003 provides that a duplicate is admissible unless it would be unfair to admit the duplicate in lieu of the original; it does not address extraneous markings on dupli-

cates. OCF has cited no authority, and we are not aware of any, that supports its assertion that the trial court abused its discretion in admitting the OCF documents.

We overrule point of error five.

## 2. The "63 Series" exhibits

In its first four points of error, OCF asserts that the trial court erred in admitting the exhibits known as the "63 Series." Specifically, OCF asserts the trial court erred in admitting the 63 Series exhibits because: (1) the documents were not authenticated (point of error one); the documents were inadmissible as learned treatises (points of error two and three); and (3) the documents were hearsay (point of error four). The plaintiffs assert that some of the documents are non-hearsay or fall within the hearsay exceptions for ancient documents and public records and reports; they further assert that the trial court's rulings on authentication were correct under TEX.R.CIV.EVID. 901 and 902.

The 63 Series consists of approximately 50 documents, including copies of government reports and publications from both the United States and Britain, articles from trade and professional publications, corporate publications and reports, and correspondence and internal memoranda from various corporations (including OCF), all relating to the hazards of asbestos. Each exhibit included a cover sheet, prepared by the plaintiffs, describing the exhibit and specifying the authority for its admission into evidence and the source of the document. The 63 Series documents can be grouped as follows: (1) articles from recent periodicals; (2) insurance company manuals; (3) an OCF internal memorandum; (4) internal memoranda and documents of other defendants; (5) articles from periodicals published more than 20 years ago; (6) nonparty memoranda and correspondence written more than 20 years ago; and (7) government and scientific reports published more than 20 years ago.

---

**4.** OCF asserts that some of the documents were retyped versions of the copies plaintiffs had in their possession. OCF has identified three documents that it believes are retyped versions of copies of originals: OC 57, OC 146, and OC 147.

Retyped versions of these documents are attached to poor-quality photocopies of, apparently, the original document. They appear to be verbatim reiterations of the photocopies.

As previously noted, the trial court overruled all objections to these documents except objections to authentication before trial. The trial court overruled the authentication objections upon tender of the documents and admitted them into evidence. The plaintiffs then read long portions of a number of the 63 Series documents to the jury. All the 63 Series documents went into the jury room during deliberation.

## A. Preservation of error

■ Plaintiffs assert that OCF did not preserve its objections to the 63 Series exhibits. OCF may rely on both the objections to the 63 Series exhibits made by another defendant and its own objections, which were particularized in its pretrial written objections.[5] OCF objected that the documents were hearsay and not admissible as learned treatises. Objections concerning the authentication of the documents were raised at trial by other defendants.

## B. Error in admission

As noted, OCF asserts the 63 Series documents were hearsay and were not authenticated, and that the documents offered as learned treatises should not have been received into evidence, read to the jury, or submitted to the jury during its deliberations.

### 1. Learned treatises

■ Learned treatises are not excluded by the hearsay rule, even though the declarant is available as a witness,

> [t]o the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or

art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

TEX.R.CIV.EVID. 803(18). None of the 63 Series documents was "called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination." On appeal, plaintiffs do not assert that any of the documents were admissible as learned treatises. We agree with OCF that none of the 63 Series documents was admissible as a learned treatise.

### 2. Hearsay and authentication

OCF objected to the 63 Series documents on the basis that they were hearsay[6] and were not authenticated. Plaintiffs assert that some of the 63 Series documents are not hearsay at all, that many of the documents fall within the hearsay exceptions for ancient documents or public records, and that the documents were properly authenticated.

■ We need not review each of the more than 50 documents in the 63 Series to determine its admissibility, however, because OCF cannot meet its burden on appeal to show that the 63 Series, even if improperly admitted, was calculated to cause, and probably did cause the rendition of an improper judgment. *See Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 230 (Tex.1990). When erroneously admitted evidence is merely cumulative, any error in its admission is harmless. *Id.* We determine harmfulness by looking at the entire record to see whether the judgment is controlled by the evidence that should have been excluded. *Id.*

The plaintiffs offered the 63 Series exhibits to demonstrate the hazards of asbestos and

---

5. The specific written objections provide in part: [Exhibits 63–1 to 63–53] are hearsay and irrelevant to OCF, and most are inadmissible under TEX.R.CIV.EVID. 803(18) [Learned treatises.] Exhibits 63–1 to 63–7, 63–9, 63–10, 63–12 to 63–15, 63–19, 63–23, 63–26, 63–27, 63–30, 63–31, 63–35, 63–37, 63–39 to 63–41, 63–43, 63–45, 63–49, and 63–50 contain markings placed on the documents by Plaintiffs' counsel, are not true and correct copies of the originals,

and are altered documents (Rule 1003). Exhibits 63–18 and 63–35 are typed documents prepared by plaintiffs' counsel and are not true and correct copies of the original documents.

6. OCF acknowledges in its brief that exhibit 63–28 is not hearsay. Exhibit 63–28 is an OCF internal memorandum dated January 7, 1942. (Exhibit 63–28 was also admitted as an OCF document, OC–22.)

that the hazards were known or knowable in the asbestos industry for decades. The plaintiffs also introduced other documentary and testimonial evidence for the same purpose.

Even before it became a distributor and manufacturer of an asbestos-containing product, OCF, as a manufacturer of Fiberglas, had addressed the hazards associated with asbestos, and was familiar with the scientific literature and research on the subject. This knowledge is evidenced by OCF's own documents. The following are some examples.

A series of letters and internal memoranda from the 1940s (long before OCF bought the Kaylo line in 1958) reflects that OCF was concerned about establishing that their product, Fiberglas, did not—like asbestos—cause an industrial disease, and that OCF did not want to "run the risk of smearing Fiberglas with the hazards of exposure to asbestos." In correspondence to customers during that decade, OCF stated that glass fibers were "unlike asbestos fibers, exposure to which does involve the danger of contracting the form of lung pathology known as asbestosis."

Also during the 1940s, OCF considered using its knowledge of the dangers of asbestosis as a tool in dealing with the industry's union. Plaintiff's exhibit OC–22 is an OCF memorandum dated January 7, 1942; the subject is the Asbestos Workers Union. Because fiberglass made users itch, members of the Asbestos Workers Union who worked with fiberglass were demanding a premium for working with the substance. The author of the "smoking gun" memo, as the plaintiffs call it, was Edward Ames, OCF's director of public relations at that time. The memo contained a strategy for dealing with the union. Ames proposed:

> Gather as a weapon-in-reserve an impressive file of photostats of medical literature on asbestosis. *Available are two bibliographies covering medical literature in 1938, citing references to scores of publications in which the lung and skin hazards are discussed. This file would cover five or six hundred pages,* which could be microphotographed in the library of the Surgeon General in Washington or some other medical library.

(Emphasis added.) The memo further suggested that if the union leaders were uncooperative, OCF should "use the asbestosis weapon-in-reserve and let them stew" and that "the way is opened to spread word among the locals about the refusal of the Union officials to make [insurance coverage and industrial hygiene precautions] available to the members [who handle Fiberglas products] and *to play all the stops on asbestosis.*" (Emphasis added.)

Moreover, as early as the 1940s, OCF had in its files documentation about shipyard insulation workers who had developed asbestosis. It had copies of public health bulletins about the effect of inhalation of asbestos dust. In letters to OCF, doctors conducting tests on Fiberglas repeatedly made reference to the dangers of exposure to asbestos; a 1941 letter from Dr. Leroy Gardner of the Saranac Laboratory states in part: "I feel quite positive that we are not going to encounter any evidence of an asbestos-like reaction because none of the [Fiberglas] fiber reaches the interior of the lungs." In a 1956 letter from Dr. G.W.H. Schepers of the same laboratory regarding a study on the pathogenicity of Fiberglas, the doctor states in part, "I suppose you already know that asbestos is fairly well incriminated as a carcinogen and the asbestos causes lung damage by virtue of the length of its fibers, a property it shares with the fiberglas."

In the 1960s, after the company purchased the Kaylo line, internal memoranda and correspondence repeatedly refer to the dangers of asbestos exposure; by 1967, OCF was referring to the "asbestos threat" and speculated that "the Government will probably blow the whistle relative to the use of asbestos in the not too distant future." A 1968 memo regarding a report on asbestos and human health asks, "Would it be wise from a liability protection point of view to indicate that there might be 'potential hazards [associated with exposure to asbestos],' and therefore, protective measures are advisable? Our approach has been to indicate that 'all medical research to date indicates no hazard to health.' "

In 1970, in response to a suggestion that a warning label appear on Kaylo, an OCF executive wrote, "Are you saying we have to do this now? I naturally would like to delay this requirement as long as possible." And in a 1973 internal memo written by a doctor employed by OCF, the doctor wrote:

> Even with all the distortions [in a *New Yorker Magazine* article] it must be admitted that industry, particularly the asbestos industry ... have [sic] been less than vigorous in pursuing the health effects of their main product, asbestos, on the work force, and worse still when the adverse health effects were known did not take adequate steps to control the working environment.

The plaintiffs read the deposition testimony of several retired OCF executives and employees to the jury. Their testimony reflected that OCF had knowledge of the risks associated with asbestos as early as the 1940s.

We hold that the 63 Series exhibits were cumulative of other, properly admitted evidence. *See Rogers,* 863 S.W.2d at 179; *Pool,* 813 S.W.2d at 677. Any error in admitting the 63 Series exhibits was therefore harmless.

We overrule points of error one, two, three, and four.

## 3. Exhibits offered against codefendants and general exhibits

In points of error six through 14, OCF asserts that the trial court erred in admitting approximately 560 exhibits. These exhibits included those offered by the plaintiffs against OCF's codefendants, as well as those offered as general exhibits. OCF asserts that none of the exhibits was authenticated.[7]

■ We note, first, that OCF's written pretrial objections to the documents relating to its codefendants included the objection that the documents were "unauthenticated as to OCF." OCF's points of error concerning these documents concerns authentication. We assume, based on its trial court objection, that OCF does not

mean the documents were unauthenticated—and therefore inadmissible—with respect to the defendants to whom the documents relate; in other words, we assume that OCF's argument is that the documents were unauthenticated, and therefore inadmissible, only as to OCF. When the trial court admits evidence that is admissible as to one party but not admissible as to another party, it shall, upon request, restrict the evidence to its proper scope and instruct the jury accordingly; in the absence of such a request, however, the trial court's action in admitting such evidence without limitation shall not be a ground for complaint on appeal. TEX.R.CIV.EVID. 105(a). OCF does not argue on appeal that it requested a limiting instruction regarding its codefendants' documents. OCF has therefore waived appellate complaint regarding these documents.

■ We further hold that OCF did not carry its appellate burden of establishing that the admission of the complained-of documents was calculated to cause, and probably did cause the rendition of an improper judgment. OCF did not address the issue of harm at all in its original brief. In its reply brief, OCF asserts that it was harmed by the admission of documents relating to other defendants because the plaintiffs, "throughout the trial, talked about 'defendants' and 'manufacturers' interchangeably, without distinguishing between individual Defendants.... It was clear that the Plaintiffs' theory throughout the trial [was] that if one Defendant actually knew of the dangers resulting from the use of asbestos-containing products, other Defendants either knew or should have known."

■ In a failure-to-warn case, the plaintiff must establish that the dangers were reasonably foreseeable or scientifically discoverable at the time of exposure before a defendant can be held liable. *Pool,* 813 S.W.2d at 668. All manufacturers are held to the knowledge and skill of an expert. *Dartez v. Fibreboard Corp.,* 765 F.2d 456, 461

---

7. Although OCF objected at trial that these documents were hearsay as to OCF, it has "chosen

not to pursue these hearsay rulings as separate points of error."

(5th Cir.1985);[8] *Pool,* 813 S.W.2d at 668. They are obliged to keep abreast of any scientific discoveries and are presumed to know the results of all such advances. *Dartez,* 765 F.2d at 461. Each bears the duty to fully test its products to uncover all scientifically discoverable dangers before the products are sold. *Id.* Thus, OCF's actual knowledge of "the dangers resulting from the use of asbestos-containing products" is not the issue. *See id.* Whether OCF was aware of information regarding the dangers of asbestos use at the time of exposure or marketing is immaterial since, as an asbestos manufacturer, it is charged with the duty to know the dangers of asbestos products. *See Keene Corp. v. Belford,* 881 S.W.2d 608, 610 (Tex. App.—Corpus Christi 1994, no writ). Thus, if the dangers of asbestos were known by other manufacturers at the time of the plaintiffs' exposure, the same risks were scientifically discoverable by OCF. *See Dartez,* 765 F.2d at 461; *Pool,* 813 S.W.2d at 668. Therefore, the admission of any documents that reflected the knowledge of OCF's codefendants was not calculated to cause, and probably did cause the rendition of an improper judgment.

We overrule points of error six through 14.

### 4. Plaintiffs' exhibit 1952

In points of error 15 through 17, OCF complains that the trial court erred in admitting plaintiffs' exhibit 1952, overruling defendants' motion for a mistrial after a portion of the exhibit was read to the jury, and overruling defendants' objections to the instruction given to the jury by the trial court after the trial court struck exhibit 1952.

Plaintiffs' exhibit 1952 contained a transcription of a statement made at an OSHA hearing by Dr. Irving Selikoff in July 1984. Plaintiffs' counsel read a portion of the statement to the jury, including the following excerpt:

[W]e do not come to these hearings with clean hands. We have many amends to make. We have wronged millions of American workers. Not you nor I, perhaps, but responsible people like us, regulators, scientific and legal advisers, state and federal legislators and authorities. The asbestos disease disaster which we now face largely unsuccessfully bears witness to our failures. To paraphrase Emerson, what has happened speaks so loudly that I cannot hear even the echoes of what was said should have happened. We have consistently greatly underestimated or ignored warnings of disease and death that were reported to us in the 1920s, the 1930s, the 1940s, the 1950s, and the 1960s.

The tragedies were played on no small stage but throughout our land. From 1940 to 1979, more than 27 million American workers were significantly exposed to asbestos in ships at shipyards, refineries, chemical plants, utilities, railroads, factories, the construction industry. *As a result, according to calculations by Dr. W.J. Nicholson, 100,000 workers have already died of asbestoses-related cancer and 350,000 more will die before this unhappy legacy of the past is dissipated. Perhaps Dr. Nicholson is somewhat in error in his computations, careful as they may have been. Perhaps only 80,000 have so far died. Or it could have been 120,000. Perhaps only 300,000 more will lose their lives. Or it may be 400,000.* Whatever the exact total, it can only be regarded as a major disaster in our social, economic, industrial, and labor history.

Defense counsel moved for a mistrial, which the trial court took under advisement. Two days later, the trial court denied defendants' motion for mistrial, but ruled that exhibit 1952 was inadmissible hearsay and ordered it stricken. The trial court noted that although portions of the exhibit (not the portion quoted above) were relevant to

---

**8.** In *Dartez,* a case similar to the one before us, the Fifth Circuit reversed a judgment against several asbestos manufacturers because of the erroneous admission of evidence. *Dartez,* 765 F.2d at 475. The federal rules of civil procedure provide that error in the admission or exclusion of evidence is harmless only if the error "does not affect the substantial rights of the parties." FED.R.CIV.P. 61; *see Dartez,* 765 F.2d at 469. The *Dartez* court reversed because "we cannot say with conviction that this evidence did not affect the jury's determination." *Dartez,* 765 F.2d at 469.

the issues in the case and cumulative of other evidence already admitted, the statements of Dr. Selikoff italicized above were not cumulative, and that he would instruct the jury to disregard those statements. The trial court went on to consider whether "the inadmissible statistical recitations made by Dr. Selikoff ... were so prejudicial and inflammatory that a proper instruction would be inadequate." The trial court concluded that "the jury can properly disregard the inadmissible presentation and a proper instruction will cure the error."

The trial court gave the following instruction:

Ladies and gentlemen, I want to give you an instruction and some directions I want you to follow.

The court admitted into evidence plaintiffs' 1952 which Mr. Ballard read to you or read excerpts from to you on Monday. That document should not have been admitted into evidence by me and therefore cannot be considered by you as any evidence in this case. It is therefore withdrawn at this time from your consideration. You are instructed, therefore, to disregard and not consider anything that was read to you from plaintiffs' 1952. And that is Dr. Selikoff's July 2nd, 1984, address to the Occupational Safety and Health Administration. Specifically, you are to disregard any and all matters read to you from PX 52 [sic] regarding the history of asbestos, reference to asbestos exposures, studies, diseases, past calculations of asbestos-related diseases, and any projected prognosis or future calculations. In short, disregard from plaintiffs' 1952 what you have already heard and don't consider any information gleaned from that exhibit for any purpose. You may consider—excuse me. You may continue to consider all the other evidence that has been presented and will be presented during this trial, documentary or testimony by witnesses and give it whatever weight, if any, you choose.

**9.** OCF apparently does not argue on appeal that the instruction was a comment on the weight of

The defendants objected to the instruction as inadequate because the trial court could not "unring a bell," and because the instruction was a comment on the weight of the evidence, and moved for a mistrial. The trial court overruled their objection.

 We cannot reverse the judgment of the trial court unless an error was calculated to cause and probably did cause the rendition of an improper judgment. TEX. R.APP.P. 81(b)(1); *Texas Cookie Co. v. Hendricks & Peralta, Inc.,* 747 S.W.2d 873, 881–82 (Tex.App.—Corpus Christi 1988, writ denied). Moreover, an appellate court must presume that a jury properly followed the trial court's instructions. *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.,* 642 S.W.2d 160, 167 (Tex.1982); *Texas Cookie Co.,* 747 S.W.2d at 882.

We will presume that the jury followed the trial court's limiting instruction to disregard the inadmissible evidence read to the jury by plaintiffs' counsel. To the extent that OCF suggests the inadmissible evidence was so prejudicial that the harm could not be cured by the limiting instruction, we conclude that OCF did not demonstrate that the error was calculated to cause and probably did cause the rendition of an improper judgment.[9]

We overrule points of error points of error 15 through 17.

### 5. Classified military documents

 In points of error 18 through 21, OCF asserts that the trial court erred in: allowing evidence concerning military documents that had been classified until 1984 on the issue of the defendants' knowledge on the state of the art issue; overruling the motions for mistrial based on the improper admission of improper military documents; failing to properly instruct the jury to disregard the classified military documents that had been improperly admitted; and admitting exhibits 1947, 1948, and 1949 because the documents had been classified until 1984 and were irrelevant and unfairly prejudicial.

the evidence.

The evidence about which OCF complains relates to studies performed by the Navy during World War II concerning the effects of asbestos exposure on shipyard workers. Exhibits 1947, 1948, and 1949 are industrial health surveys of three different shipyard locations. The Navy conducted the surveys in 1942. Nothing on these exhibits indicates they were classified. However, Kenneth Nelson, who is listed as a coauthor of exhibits 1947 and 1948, testified that those exhibits were, at the time they were written, classified. Apparently, some of the classified documents were not declassified until 1984. Nelson and other witnesses answered questions about these exhibits and other documents.

After Nelson's deposition was read to the jury, counsel for one of OCF's codefendants moved "to strike any testimony in this trial concerning this nonpublic information which has been offered for the purpose of notice of what my client should have known." The trial court sustained this objection, but overruled the defendants' motion for mistrial. The trial court then instructed the jury:

I did not intend to allow you to consider any evidence about any unpublished reports, because if reports were confidential or unpublished by anyone, they obviously could not go to the issue of notice until such time as they became public. Because if they were unpublished or confidential, no one else could know about them. So my instruction to you is this: Any evidence that you have had presented to you about information being contained in reports that were not made public, that were government reports or any other reports or unpublished reports of the Drinker study or any reports that were not published, you must disregard that and you cannot consider that as any evidence whatsoever on the issue of notice until if and when evidence is presented that information contained in those reports did become public. Once it became public information, then you can consider it and give it whatever weight, if any, you choose. I'll let you remember what the testimony is. And then it can be considered in relationship to the notice question of the state-of-the-art question as it existed at the time, if it does

become an issue that those reports became public information.

The trial court then admitted into evidence exhibits 1947, 1948, and 1949, noting that nothing on these exhibits reflected they had been classified material.

Counsel for Owens Illinois objected to the trial court's instruction on the following bases:

I respectfully object that your instruction is not going to, no instruction would be able to cure the prejudice to my client from this information, having first gone to them and then the court retroactively ruling and telling them to disregard it. I believe, with all due respect, the instruction is an improper comment on the evidence and we renew our motion for a mistrial. Your Honor, I don't believe we can cure this. I believe there are numerous instances, as I indicted before, where this nonpublished information was in fact mentioned in the testimony through the questions of other witnesses. And Your Honor's instruction said that unless and until there's proof that that was—that that's published information, whether its a government report or anything else, the jury couldn't—can't consider it in this case. Well, our record, I'll respectfully submit, is full of that stuff. Repeatedly unpublished materials have been the subject of cross-examination, materials just like the draft Fleisher–Drinker article which was the subject of cross-examination of Dr. Kerby.... And I don't think we can cure that taint, Your Honor, and for that reason I respectfully request a mistrial.

OCF and Allied Signal joined in this motion. Counsel for OCF added:

[O]ur inability to anticipate and clear up the depositions of our own witnesses, expert witnesses, prospective expert witnesses on questions of this sort, pending the ruling of the court, now leaves the jury required to disregard the knowledge that—if the court please, the knowledge did exist, and try to remember that we just didn't know about it.

The plaintiffs argued in response that, among other things, "[i]nformation regarding haz-

ards do [sic] not have to be published to be admissible." Several days later, after hearing additional argument, the trial court denied the motion for mistrial.

■ OCF asserts that the trial court erred in admitting exhibits 1947, 1948, and 1949 because they were classified until 1984, and should not have been used to establish OCF's knowledge of the hazards of asbestos. We disagree that the documents were inadmissible for this reason. As we have already noted, it does not matter whether a manufacturer was aware of information regarding the dangers of asbestos use at the time of exposure or marketing because an asbestos manufacturer is charged with the duty to know the dangers of asbestos products. *Belford,* 881 S.W.2d at 610. If the dangers of asbestos were known by other manufacturers or *by the Navy* at or before the time of the plaintiffs' exposure, the same risks were scientifically discoverable by OCF. *See Pool,* 813 S.W.2d at 668.

Even if these documents were inadmissible, OCF cannot demonstrate harm. The information about asbestos contained in these documents is cumulative of other properly admitted evidence, so any error in admission would be harmless. *See Mancorp, Inc.,* 802 S.W.2d at 230. For this reason, any error in admitting the exhibits or deposition testimony relating to these exhibits or other allegedly classified documents is harmless.

We overrule points of error 18, 19, 20, and 21.

### Discussing mediation with the jury

■ In points of error 22 and 23, OCF asserts the trial court erred in "allowing the jury to decide whether or not to refer the case to mediation during the trial" and in overruling the defendants' motion for mistrial.

After the jury was impaneled but before opening statements, the trial court summoned the jury and, in the absence of the parties and the attorneys, made the following comments:

I want to talk to you for two or three minutes and let you make your first decision of the trial. And I don't want you to draw any innuendos or inferences from what I say about the merits of this case. I know nothing about the merits of this case. That's what you're called upon to determine, is to listen to all sides in this case and call it as you see it. You've heard voir dire, so you know what kind of case it is. This case is going to take, we anticipate, about three weeks to try. As you know, we've got three plaintiffs and we've got 10 defendants. And you know pretty much what the issues are going to be.

Any time we have a lawsuit, we make attempts to resolve some or hopefully all of the matters that are in dispute before we ever get to trial. In this particular case, I have a mediator available who can come in and spend a day or two mediating this case, attempting to resolve some of the issues and some of the parties [sic]. Now, I've not ordered this case to mediation because it wasn't in a posture to have what I considered any type of fruitful discussions. Whether it is now or whether it's not I don't know. He would be doing basically what is your job is doing [sic]. He would be listening to both sides on a shorthand rendition and ultimately making recommendations. If he's unsuccessful, then we would continue with the case; if he's successful, well then it would maybe shorten the time of trial maybe a little bit, maybe a lot, I don't know.

Bottom line on all this is if I choose to order it mediated, I need to choose to order it mediated before we start today. *His mediation date would be November 2nd. Either way it goes, you're going to be up here about two and a half to four weeks.... However, I don't want to overlook a possible alternative partial or maybe full solution to this case short of maybe spending three weeks of your time. But the alternative is if I order mediation on November the 2nd, that means we would pick the case up after that, if we didn't resolve all of it, and probably you would have to plan on the same period of time. What this means is that it would be a couple of weeks before Thanksgiving, probably a couple of days, Monday, Tuesday or maybe Wednesday before Thanksgiving, and if we didn't finish it, then we*

*would come back and just wrap it up the following week.*

Now, I want you to decide among yourselves, and I don't care about a unanimous decision one way or another, *if you people would be interested in recessing this case for a couple of weeks and then coming back or if you want to go ahead today.* I'll be very candid with you. It doesn't make ne [sic] a lot of difference one way or another. I'll be trying other cases. But that's what I wanted to talk to you about. . . . *I realize you have not been prepared for that period of time. We didn't prepare you for voir dire on who's got vacations. I don't know, you know, what kind of commitments that you may have during that period of time. And I'm not even suggesting it. I'm suggesting that that's a viable alternative. But I would never do this at this stage without clearing it with the jurors first. . . . And again I don't want you to draw any implications or inferences one way or another as to the merits of this case. You're going to have to call that. But this is one possible resolution of perhaps some or all of the issues in the case. And I can't guarantee that it will be successful. But it may. If it is, well, you've saved some time; if it's not, well then all you've done is delay this until, oh, November the 3rd or 4th or somewhere around there.*

The trial judge allowed the jurors to discuss the issue for about five minutes. When he returned, the jury informed him that they preferred that he try the case immediately. The trial judge later informed the attorneys:

A few minutes ago I took the jurors and put them in the big courtroom and inquired of them to decide [sic] whether they wanted to delay this case for a couple of weeks for me to send this case to a mediator. . . . I didn't tell them anything other than that I had an alternative and if they wanted to come back in two or three weeks I had that option available. They were not interested. They're ready to go to trial. That resolves the mediation. I'm telling you because I had the court reporter present and it's all on the record.

The defendants made a motion for mistrial, which the trial court denied.

OCF asserts that allowing the jury to decide whether to refer the case to mediation planted an irrevocable suggestion in the jurors' minds that there was potential liability on the part of some or all of the defendants.

We think it is clear that the trial court consulted the jury on this issue because it was concerned about the jurors' time commitments. We conclude that any harm in the reference to mediation was cured by the trial court's strict admonition that the jurors were not to infer from his remarks anything about the merits of the case. OCF has not demonstrated harm.

We overrule points of error 22 and 23.

### Dr. Kerby

In points of error 24 through 27, OCF asserts that the trial court erred in allowing plaintiffs: (1) to call Dr. Gerald Kerby for the sole purpose of attacking his credibility; (2) to ask Dr. Kerby leading questions because Dr. Kerby was not a hostile witness; (3) to solicit expert opinions from Dr. Kerby; and (4) to examine Dr. Kerby about hearsay documents and documents not in evidence.

OCF and another defendant designated Dr. Kerby as an expert witness. The plaintiffs designated him as a fact witness. The plaintiffs sought to present deposition testimony of Dr. Kerby during their case-in-chief, even though the defendants announced their intention to call Dr. Kerby to the stand during their case-in-chief. During the deposition, the plaintiffs asked Dr. Kerby leading questions. At trial, the plaintiffs asked the trial court to designate Kerby as an adverse witness and to allow the leading questions posed in the deposition. OCF objected, asserting that Dr. Kerby was neither an adverse party nor a witness identified with an adverse party. OCF further asserted that,

as a witness called by the plaintiffs, should Dr. Kerby be so-called, they are bound by his testimony, which relates purely and simply to state-of-the-art. They cannot, in all fairness, put him up and under the guise of direct examination, cross-examine him, then after he's presented live, . . .

under the guise of either direct or redirect or cross-examination do the same thing once again. . . .

The plaintiffs asserted in response that because Dr. Kerby "has been designated and used by the defendants from coast to coast, north to south, and as such he is identified with them," the rules of evidence permitted them to ask him leading questions. They also asserted: "It's our concern that Dr. Kerby will not be called to testify live by the defendants and the jury would be deprived of the benefit of the attack that we made upon his position. . . ."

The trial court stated:

Let me tell you very candidly where I stand on this point. I want to check a couple of cases on it to find out if an expert designated by an opposite party qualifies as an adverse witness under the rules. I don't know of any case that tells me they do. If he's an employee in the accompaniment of that company and is his compensation [sic] because he's employed by the party means that the particular party is his employer [sic], there's no question about that, that he's an adverse witness. But the mere fact that he's designated as an expert by someone else, that in and of itself I'm not sure qualifies him as an adverse witness. I want to check that out. . . .

As far as the plaintiffs designating him as a witness having knowledge of relevant facts, he's not testifying as a fact witness in this case, he's testifying as an expert witness. I'll tell you right up front if I let him testify as an adverse witness, I don't intend to give the jury an instruction. Or if I let him testify as a witness on behalf of the plaintiff[s], I don't intend to give an instruction that they're bound by his testimony, because I don't think that's the law anymore. I think you can call a witness and you're not bound by their testimony. . . .

*But the question, very candidly, is whether I'm going to allow you to call him as their expert witness and treat him as an adverse witness.* Because you've not designated him as an expert. . . .

The trial court then ruled as follows:

The motion to quash Dr. Kerby's deposition as called by the plaintiffs is denied. My reasoning is as follows: *First of all, you can't call—plaintiffs can't call him as an expert witness because you've not designated him. You have designated him as a lay witness. His testimony is a combination of both expertise on the effects of asbestosis and lay testimony dealing with notice and knowledge. But they're intermingled to the point that it's too difficult to determine which portions should be allowed and which shouldn't.*

The rule on adverse witnesses is that, first of all, certain witnesses are adverse as a matter of law: employees of parties, parties and so forth. If you don't have that, as I understand the law, the court's got to make a discretionary determination, which means the court has to have affidavits or a synopsis of the witness's testimony or hear the evidence out of the presence of the jury to determine if he's hostile. *I have had the benefit of reading the entire deposition. There's no question in my mind he's hostile to the plaintiffs. So I'm concluding he is a hostile witness.* I'll allow the plaintiffs to call him as such and treat him as such. So Dr. Kerby's deposition will be allowed to be presented as an adverse witness [sic] at this time.

After the plaintiffs presented Dr. Kerby's deposition testimony, OCF abandoned its plans to call him.

 OCF asserts in point of error 24 that the trial court erred in allowing the plaintiffs to call Dr. Kerby during their case-in-chief for the sole purpose of attacking his credibility. OCF asserts, "[I]t is highly improper to call an opponent's expert witness prior to his direct testimony for the sole purpose of trying to impeach his credibility."

OCF has provided no authority to support this argument. Tex.R.Civ.Evid. 607 provides that the credibility of a witness may be attacked by any party, including the party calling the witness. We know of no rule of evidence or procedure that precluded the plaintiffs from calling Dr. Kerby during their case-in-chief.

■■ OCF asserts in point of error 25 that the trial court erred in allowing the plaintiffs to ask Dr. Kerby leading questions because he was not a hostile witness.

Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the testimony of the witness. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

Tex.R.Civ.Evid. 611(c). The decision whether to allow trial counsel to ask leading questions lies within the trial court's discretion. *Cecil v. T.M.E. Inv., Inc.,* 893 S.W.2d 38, 47 (Tex.App.—Corpus Christi 1994, no writ); *Coronado v. Employees Nat'l Ins. Co.,* 577 S.W.2d 525, 531 (Tex.Civ.App.—El Paso), *aff'd,* 596 S.W.2d 502 (Tex.1979). To obtain reversal on this point, OCF must show that (1) the trial court abused its discretion in allowing plaintiffs to lead Dr. Kerby, and (2) this abuse of discretion probably caused rendition of an improper judgment. *See Cecil,* 893 S.W.2d at 47.

We need not address whether the trial court abused its discretion in allowing the plaintiffs to ask Dr. Kerby leading questions because OCF cannot demonstrate harm. The testimony elicited from Dr. Kerby is cumulative of other, properly admitted evidence. Thus, any error would be harmless.

■ In point of error 26, OCF asserts the trial court erred in allowing the plaintiffs to elicit expert opinions from Dr. Kerby because they had not identified him as an expert. OCF and another defendant had designated Dr. Kerby as an expert witness, but plaintiffs designated him as a fact witness.

The trial court admitted the Dr. Kerby's testimony as that of a fact witness, but indicated that it was impossible to segregate his testimony as an expert from his testimony as a fact witness:

First of all, you can't call—plaintiffs can't call him as an expert witness because you've not designated him. You have designated him as a lay witness. His testimony is a combination of both expertise on

the effects of asbestosis and lay testimony dealing with notice and knowledge. But they're intermingled to the point that it's too difficult to determine which portions should be allowed and which shouldn't.

We find nothing in the record to indicate the trial court abused its discretion in admitting the testimony on this basis.

■ In point of error 27, OCF asserts that the trial court erred in allowing the plaintiffs to examine Dr. Kerby about hearsay documents and documents not in evidence. OCF has not supported this point of error with citation to any authority. This point of error is waived. Tex.R.App.P. 74(f). Further, OCF has failed to demonstrate any harm from this alleged error; as previously noted, Dr. Kerby's testimony was cumulative of other, properly admitted evidence.

For the reasons articulated above, we overrule points of error 24 through 28. There are, however, two additional reasons for overruling these points.

OCF asserts it was prejudiced by the plaintiffs' "misuse of Dr. Kerby" during their case-in-chief because it was precluded from effectively presenting him as a witness. OCF asserts in its brief:

By allowing Plaintiffs to attack his credibility before he testified on direct examination, Plaintiffs gained an unfair advantage. Specifically, by allowing Plaintiffs to question Dr. Kerby about the unpublished shipyard reports, the trial court placed [OCF] in an impossible situation. If [OCF] called Dr. Kerby live and did not question him about the reports, that omission would be argued by Plaintiffs to be an admission that Plaintiffs' view of the documents was correct. But if [OCF] did question Dr. Kerby about the reports, that would "open the door" and allow Plaintiffs to make further use of inadmissible evidence. Rather that [sic] try to overcome that dilemma, [OCF] was forced to forego calling Dr. Kerby.

We have already held that the unpublished shipyard reports were not inadmissible on the basis that they had been classified military documents. Thus, any decision made by OCF to forego calling Dr. Kerby because of

these documents was based on the incorrect premise that the documents were inadmissible for that reason.

■ Additionally, although OCF complains that it was "precluded" from calling Dr. Kerby, it does not indicate—or refer to any portion in the record that would indicate—the substance of the testimony Dr. Kerby would have given if he had testified live during OCF's case-in-chief. OCF has thus failed to demonstrate that it was harmed or prejudiced by not calling Dr. Kerby. *See Perkins v. Volkswagen of America, Inc.,* 596 F.2d 681, 682–83 (5th Cir.1979).

We overrule points of error 24, 25, 26, and 27.

### Point of error 28: Exclusion of OCF's "enough is enough" evidence

■ In point of error 28, OCF complains that the trial court erred in excluding its "enough is enough" evidence because that evidence was relevant to the issue of the amount of punitive damages. Specifically, OCF sought to introduce the testimony of Peter Frank, a certified public accountant, who would have testified, according to OCF's trial counsel, regarding "insurance coverage available in the past and in the future; the accounting matters germane to [OCF]; its reserve for this litigation; the average cost of claims." The "crux" of Frank's testimony, asserted OCF at trial, was that "enough is enough." Plaintiffs objected on the basis that Frank's testimony would invade the province of the jury and was speculative. Counsel for OCF argued in response:

> [I]f the policy of the law is to punish, we've been punished enough. If the policy of the law is to make an example, we have been made example enough. And that's the thrust of the testimony. But I cannot say to this court that I have any case law that supports it. I cannot say to this court that I know of any jurisdiction in the state of

Texas that has yet permitted it to go to the jury.

The trial court responded:

> I'll allow him to testify as to the current net worth of [OCF].... I will not let him testify as to any of the other matters you indicated, specifically, insurance coverage, current or past, prior payments that have been made out, punitive damages or ordinary damages or otherwise. It goes to the general history of the company. And the "enough is enough" theory is just not the law, in my opinion.

OCF declined to call Frank as a witness, and tendered Frank's testimony in a Florida lawsuit, as well as certain exhibits, as an offer of proof.

OCF asserts that the trial court's ruling deprived it of the opportunity to present relevant evidence to the jury. OCF has cited no authority—and we are aware of no authority—that supports the proposition the trial court erred in excluding the "enough is enough" evidence.[10] Indeed, OCF's trial counsel represented to the trial court, "I cannot say to this court that I have any case law that supports it. I cannot say to this court that I know of any jurisdiction in the state of Texas that has yet permitted it to go to the jury." We conclude that the trial court did not abuse its discretion in excluding this evidence.

OCF further argues that "the continued imposition of punitive damages against [OCF] for a single course of conduct violates due process and due course of law," and that by excluding its "enough is enough" evidence, the trial court denied OCF "the opportunity to build the necessary evidentiary record to establish the due process violation." OCF made an offer of proof, consisting of Frank's testimony in other litigation, as well as the documents on which his opinions were based. We do not understand how the trial court's ruling deprived OCF of the opportunity to build an evidentiary record.[11]

We overrule point of error 28.

**10.** OCF cites *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10 (Tex.1994), and asserts that nothing in that decision precludes its "enough is enough" evidence. Nothing in *Moriel,* however, addresses the admission or exclusion of evidence on the issue of punitive damages.

**11.** OCF's point of error relates to the trial court's ruling in excluding its "enough is enough" evidence; OCF has not raised a point of error

## Cumulative error

■ In its 29th point of error, OCF asserts that a new trial should be granted "based upon the cumulative error that occurred during trial." Specifically, OCF asserts that in addition to the points of error raised in its brief, the "following incidents added to [OCF's] inability to receive a fair trial:" repeated references to insurance; improper use of witnesses; use of hearsay documents; allegations of dishonesty made by plaintiffs' counsel regarding the defendants' witnesses; and an improper comment on the weight of the evidence made by the trial court.

■ OCF declined to brief these "incidents" as points of error, yet seeks to rely on these "incidents" as evidence of error contributing to cumulative error. To the extent that OCF implies that these "incidents" constituted error and seeks a determination from this Court that these "incidents" constituted error, we note, first, that their inclusion makes this point multifarious. A point of error is multifarious if it embraces more than one specific ground of error, or if it attacks several distinct and separate rulings of the trial court. *Clancy v. Zale Corp.*, 705 S.W.2d 820, 823 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). This Court may disregard any assignment that is multifarious. *Id.* at 824. Second, OCF has supported none of its arguments concerning these "incidents" with authority. Failure to cite authority in support of error on appeal waives the complaint. Tex.R.App.P. 74(f). We decline to consider whether these "incidents" constitute error, and we reject as improper OCF's attempt to use heretofore unbriefed allegations of error as evidence of cumulative error that would mandate a new trial.

■ Multiple errors, even if considered harmless taken separately, may result in reversal and remand for a new trial if the cumulative effect of such errors is harmful. *Pool*, 813 S.W.2d at 695. Before we may reverse a judgment and order a new trial, we must determine that the error committed by the trial court was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Id.* at 695–96; Tex. R.App.P. 81(b)(1). The appellant must show that, based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict favorable to it. *See Pool*, 813 S.W.2d at 695.

OCF asserts that the combined effect of the alleged errors deprived it of a fair trial. OCF does not assert that, but for the alleged errors, the jury would probably have rendered a verdict in its favor, and we believe OCF has not met this burden. We do not find cumulative error that probably caused the jury to render an improper verdict.

We overrule point of error 29.

## Conclusion

We affirm the trial court's judgment.

regarding the alleged violation of due process, and we decline to address this issue.