

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00233-CV

———————————————

IN THE GUARDIANSHIP OF N.P., AN INCAPACITATED PERSON

---

On Appeal from Probate Court No. 2
Tarrant County, Texas
Trial Court No. 2018-GD00257-2

---

Before Sudderth, C.J.; Gabriel and Kerr, JJ.
Memorandum Opinion by Justice Kerr
Dissenting Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

This is an appeal from an order creating a limited guardianship of the person of N.P. (Noelle)[1] under Section 1101.152 of the Estates Code. *See* Tex. Est. Code Ann. § 1101.152. The probate court declined to grant the full guardianship, *see id.* § 1101.151, that was recommended by her treating physician of roughly ten years, the court's investigator, and Noelle's parents, and which Noelle's attorney ad litem did not argue against or refute. In multiple issues, Appellants M.P. (Mother) and J.P. (Father) challenge the probate court's denial of their application to be appointed full guardians of the person of their intellectually disabled adult daughter. Because we hold that the probate court abused its discretion in not appointing guardians with full authority when the need was uncontested and the evidence supported it, we reverse.

**Background**

With an IQ between 50 and 70, Noelle has been diagnosed with a mild intellectual disability as well as autism, disruptive mood dysregulation, attention-deficit/hyperactivity disorder, and anxiety disorder. Noelle lives with her Mother and Father. In September 2018, shortly before Noelle's eighteenth birthday, her parents applied to be appointed guardians of her person. *See id.* § 1103.001 (providing that within 180 days of a minor's 18th birthday, a person may file an application for a minor who, because of an incapacity, will require a guardianship after turning 18).

---

[1] "Noelle" is a pseudonym.

The day after the application was filed, the probate court appointed Arlene Shorter—who at the time was a 20-year assistant court investigator for Tarrant County Probate Court No. 2—to function as the Court Visitor.[2] *See id.* § 1054.103.

Shorter filed the statutorily required sworn court-visitor report after meeting with Noelle, Father, and Mother in their home. *See id.* §§ 1054.103, .104. Shorter's report recommended the appointment of a full guardianship, stating that (a) supports and services were considered and were not sufficient; (b) alternatives to guardianship were considered but were not feasible; (c) Noelle needed a guardian to make placement (residential) decisions, medical decisions, and financial decisions; and (d) Noelle's rights to drive, vote, dispose of property, and marry should be removed.

Among many other things, Shorter's report noted that

- Noelle's parents reported Noelle's age equivalent as that of a third- or fourth-grader;

---

[2]The hearing record does not really distinguish between Shorter's role as assistant court investigator and court visitor, although the latter position carries with it the obligation to file the detailed written evaluation that Shorter provided. *See id.* § 1054.104. A court investigator, on the other hand, is charged with filing "a report containing the court investigator's findings and conclusions after conducting an investigation" under (as applicable here) Section 1054.151 into the "circumstances alleged in the application to determine whether a less restrictive alternative to guardianship is appropriate." *See id.* §§ 1054.153(a), .151. Two and a half weeks after the guardianship application was filed, the probate court's chief court investigator filed a one-page report in which he noted that "Court Investigator is undertaking investigation into less restrictive alternatives to a guardianship of the person through appointment of a Court Visitor." From that point, the chief court investigator deferred entirely to Shorter. We will refer to Shorter as either court visitor or court investigator where appropriate.

- Noelle could not give informed consent for medical care; had several medical concerns; was frequently dehydrated because she would not drink water without prompting or reinforcement, leading to as many as 10–12 emergency-room visits per year; and had seen several cardiologists during the past year;

- Noelle "did not assess risk in her environment" and according to her parents was "very trusting of strangers";

- Noelle self-reported that she could not take care of herself because of her autism and that she had memory problems and would forget things she was told to do;

- Noelle did not require assistance with activities of daily living (ADLs) but did need "a lot of prompting";

- Noelle could not, with supports and services, meet her needs for food, clothing, or shelter; care for her physical or mental health; manage her financial affairs; or make decisions concerning her residence, voting, operating a motor vehicle, and marriage;

- although some supports and services were available and being used by Noelle and her parents, Noelle did not have the requisite mental capacity to consent to allow her parents to assist with accessing them; and

- because Noelle's cognitive impairments precluded her from executing any legal documents, none of the listed alternatives to guardianship was a possibility.

The court separately appointed Bonny Link as Noelle's attorney ad litem, a mandatory appointment "to represent the proposed ward's interests." *See id.* § 1054.001; *see also id.* § 1002.002 (defining attorney ad litem). The appointment order set out the duties required of that position under the Estates Code, among other instructions. *See id.* § 1054.004. The order specified that Link was not to file a written report, and she did not do so.

4

## 1. Noelle's parents' evidence

At the March 2019 hearing, Noelle's parents testified about the need for a guardianship and introduced the statutorily required Physician's Certificate of Medical Examination (CME) from Noelle's long-time treating physician Dr. Shanti Nagireddy. *See id.* § 1101.103.[3] Dr. Nagireddy, who did not testify at the hearing, also provided an affidavit. The attorney ad litem stipulated to the admissibility of both the CME and affidavit, and she voiced no objection to their being admitted.

Like Shorter's report, Dr. Nagireddy's CME supported a full guardianship, describing Noelle as totally incapacitated. The CME diagnosed Noelle with the mental conditions described previously, noted "moderate" severity and a poor prognosis, and found no possibility for improvement. According to the CME, Noelle cannot initiate and make responsible decisions regarding:

- making complex business, managerial, and financial decisions;
- managing a personal bank account;
- safely operating a motor vehicle;
- voting in a public election;
- making decisions about marriage;

---

[3]Dr. Nagireddy used the prescribed CME form posted on the website of Tarrant County Probate Court No. 2. *See* https://www.tarrantcounty.com /content/dam/main/probate-courts/probate-court-2/CME_2015_with_legislative_ changes.pdf (last visited Nov. 30, 2020). Alternatively, a physician may file a letter containing the same information. *See id.* § 1101.103.

5

- determining her own residence;

- administering her own medications;

- attending to basic ADLs—for example, bathing, grooming, dressing, walking, toileting—with *and* without[4] supports and services;

- attending to instrumental activities of daily living (like shopping, cooking, traveling, and cleaning); and

- consenting to medical, dental, psychological, or psychiatric treatment.

Dr. Nagireddy also indicated on the CME that Noelle would not be able to "attend, understand, and participate" in the guardianship hearing and recommended against her attending the hearing.[5] The doctor concluded that Noelle is totally incapacitated. The least restrictive placement the doctor considered appropriate for Noelle is with her family.

---

[4]Dr. Nagireddy apparently checked both boxes on this part of the CME form in error rather than selecting only one of those two options. The probate court pointed to this mistake as making the CME "inconsistent within itself in that it indicates [Noelle] cannot attend to her own ADLs without and with supports and services indicating [Noelle's] ADLs are not taken care of which conflicts with other evidence including [Noelle's] appearance in court." Within the context of the CME as a whole, we do not find this error to be material or to otherwise render the CME unreliable or incompetent, particularly since neither the court investigator nor the attorney ad litem disagreed with the recommendation of a full guardianship.

[5]The fact that Noelle did attend and participate in the hearing (though how much she understood is not apparent) does not negate Dr. Nagireddy's opinion that Noelle is totally incapacitated and that no feasible alternatives or supports and services exist that would avoid the need for a full guardianship.

Dr. Nagireddy's affidavit stated that based on her medical expertise and to a reasonable medical probability, Noelle is totally incapacitated. She further opined that Noelle is unable to make any decisions for herself even with assistance and that Noelle does not have the capacity to execute a power of attorney or a supported decision-making agreement, nor does Noelle have the capacity to understand a simple or complex legal document.

Dr. Nagireddy also opined that she did not believe that Noelle has the "ability to consent to educational decisions, consent to receive governmental services, or consent to employment." Similarly, no supports and services were available that would enable Noelle to "(a) meet her needs for food, clothing, or shelter, (b) care for her physical or mental health, (c) manage her financial affairs, and (d) make personal decisions regarding residence, voting, operating a motor vehicle, or marriage." Dr. Nagireddy's affidavit additionally expressed her belief that Noelle would be susceptible to abuse and exploitation unless a guardian was appointed to make decisions on Noelle's behalf and concluded by stating that "it is [Noelle's] best interest for a guardian of the person with full authority be appointed for her."

Father's testimony corroborated Noelle's need for a guardianship. In answers to a series of leading questions, Father agreed with Dr. Nagireddy that Noelle could not meet her own needs for food, clothing, or shelter; could not care for her physical or mental health or manage her own financial affairs, *see id.* § 1002.017 (defining "incapacitated person" as including an adult who cannot do those things due to a

physical or mental condition); and could not make personal decisions regarding residence, voting, operating a motor vehicle, or marriage, *see id.* § 1002.031 (describing "supports and services" as including formal and informal resources and assistance that enable a person to make those particular decisions). Father concurred with the doctor's assessment that Noelle should not retain the rights to vote, determine whether she gets married, determine her residence, or operate a motor vehicle.

In Father's view, after considering guardianship alternatives and other supports and services, none were workable because his daughter would not comprehend them, nor was she capable of giving informed consent. By way of example, Father opined that his daughter would not comprehend the legal significance of a power of attorney, would not understand a "supported decision-making agreement," and, generally, does not understand the significance of delegating decisions. Father stated that if Noelle agreed to something he suggested, it would be because she is "just a passive participant and doesn't fully understand what she's consenting to." According to Father, Noelle could not independently vote without undue influence.

Father acknowledged that neither he nor anyone else had tried to explain a power of attorney or a "supported assisted decision-making agreement" to Noelle, because Noelle "would not be able to understand it." Father testified that until a decision on guardianship was made, the plan at the time of the hearing was to work with the Texas

Workforce Commission[6] to try to find employment for Noelle after she got out of school that May or perhaps have her attend community college, although he expressed doubts about the latter as a viable option. Father did not envision Noelle's being able to live in an apartment by herself or with a roommate and to function, either then or in ten years. Father was not asked on cross-examination whether he thought that by accessing and using some sort of formal or informal supports and services, Noelle could make personal decisions about voting, driving a car, or getting married.

Mother then testified briefly, answering some of the same leading questions that Father had been asked and agreeing that, having heard her husband's testimony, her answers would be substantially the same if she were asked the same questions. The only question posed to Mother on cross-examination was whether she would characterize Noelle as a "high-functioning person," to which Mother responded, "Yes."[7]

## 2. The attorney ad litem's evidence presented on Noelle's behalf

Link put on testimony from Noelle and Shorter, neither of whom contradicted or disagreed with Dr. Nagireddy, Father, or Mother on the need for a full guardianship

---

[6]The Texas Workforce Commission has several programs that help disabled adults find employment. *See* https://www.twc.texas.gov/partners/programs-people-disabilities (last visited Dec. 1, 2020).

[7]The record does not indicate what Mother meant by "high-functioning," whether there is some legal significance to being "high-functioning," or what it means (if anything) in the context of a proceeding to establish the need for a full versus a limited guardianship.

and the lack of feasible alternatives or supports and services that could avoid the need for a full guardianship.

The probate court asked Noelle about her understanding of the truth, which Noelle said was "[s]omething that's not a lie," although Noelle was not asked what she thought a lie was. Consistent with the CME's reflecting that Noelle has no long-term-memory deficits, she described having worked at a grocery store for three or four weeks the past summer, apparently through the Texas Workforce Commission, later saying both that the store "actually let everyone go after three or four weeks" and simultaneously that she was let go because of her "heart problem." Noelle said that although she was "grateful" for her parents' advice and "wouldn't be anything" without them, she "probably wouldn't" comply if they told her to do (or not to do) something. But Noelle also acknowledged that even though she was now an adult, she did not believe that she would make the right decisions and that she looks to her parents for help. Noelle stated that she planned to continue living with her parents for the time being but could not predict what things would "look like in [her] 30s."[8] Noelle expressed a desire to maybe attend community college or get a job that she would be able to do, and agreed that she had heard her father's earlier testimony about that being the plan although she "didn't really understand everything he was saying."

---

[8]Father testified that Noelle had commented that she might want to move into an apartment. The probate court ultimately removed Noelle's right to determine her residence.

10

Noelle described enjoying hanging out with friends and her boyfriend at her house, where her parents would "make sure [she was] safe" by reminding her to always keep her door open. Noelle attended a church youth program and sometimes went to movies with church friends without her parents' being there, although they would check the ratings to ensure that a movie was appropriate for her to see.

Link concluded her direct examination by eliciting Noelle's agreement that she wanted the probate court to appoint her parents as her guardians because she is "not capable of doing things without my family."

The probate court asked Noelle about her grocery-store job and whether anyone had ever offered her drugs, to which Noelle answered no, volunteering that she would never take drugs even if someone offered them to her.[9] As for doctor visits, Noelle recounted that the doctor would talk to both her and her parents but mostly to her parents and that she felt "okay" with that because she "would not understand anything the doctor was saying if [her] parents weren't there." No one questioned Noelle about voting, driving, or marriage.

The final witness was Shorter, whom the attorney ad litem offered as an "expert in the field of social work, and especially in the area of guardianship." Without

---

[9]Father had expressed his fears that without a guardianship Noelle might "become homeless on the streets and then into drugs or prostitution." Father conceded that Noelle's being under a guardianship would not prevent those things from happening.

objection, the probate court designated Shorter as an expert. Testifying in narrative form from her report on file, Shorter recapped what she had learned and observed during her October 2018 visit with Mother, Father, and Noelle. Shorter agreed that Noelle functions at a third- or fourth-grade level. Asked about the advisability of Noelle's leaving her school program in May 2019 as opposed to remaining there until the permitted age of 21, *see* Tex. Educ. Code Ann. § 25.001, Shorter opined that if getting a job was being pursued, that would be a viable option to encourage self-sufficiency. Shorter further opined about Noelle's need for a guardian:

> Q. . . . Based on your knowledge of the Texas Workforce Commission, do you need a guardian -- would someone in this situation need a guardian to help them get into that program and pursue some type of employment?

> A. Just generally speaking, a person doesn't need it. Do I think [Noelle] needs it? Yes, I think she does.

> Q. Okay. So you would agree, as well, that we need a guardianship for [Noelle]?

> A. Yes.

Neither the parents' counsel nor the probate court had any questions for Shorter. Both sides rested without giving closing remarks, and the probate court took the matter under advisement. No witness or report or medical evaluation suggested that anything less than a full guardianship of the person would be appropriate for Noelle or that any feasible alternatives to guardianship or feasible supports and services existed that would

avoid the need for a full guardianship, which was the unanimous conclusion of everyone who opined on the matter.

**3. The probate court's order and findings of fact and conclusions of law**

A little over two weeks later, the probate court signed an order granting a limited guardianship. As relevant to this appeal, the order recited that (a) by clear and convincing evidence, alternatives to guardianship and supports and services available to Noelle that would "avoid the need for the appointment of a limited guardian have been considered and determined not feasible for medical, employment, and residential decisions" only; and (b) by a preponderance of the evidence, Noelle lacks capacity to make personal decisions regarding her medical care, employment, and residence, but there was "not sufficient evidence presented that [Noelle] lacked the capacity, or sufficient capacity with supports and services, to make decisions regarding marriage[,] and the Court finds there are alternatives to the Court taking away [Noelle's] right to operate a motor vehicle and vote." At Noelle's parents' request, the probate court entered findings of fact and conclusions of law, which were later amended.

Mother and Father then appealed.

**Standard of Review**

We review a probate court's guardianship determinations for an abuse of discretion. *In re Guardianship of A.E.*, 552 S.W.3d 873, 876 (Tex. App.—Fort Worth 2018, no pet.). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v.*

*Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). A trial court also abuses its discretion by ruling without supporting evidence or by misapplying the law to undisputed facts. *See Fuller v. State Farm Cty. Mut. Ins. Co.*, 156 S.W.3d 658, 660 (Tex. App.—Fort Worth 2005, no pet.). But discretion is not abused when the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

In guardianship proceedings, legal and factual sufficiency are not independent reversible grounds of error but are factors to consider in assessing whether the trial court abused its discretion. *In re A.E.*, 552 S.W.3d at 877; *see In re J.P.C.*, 261 S.W.3d 334, 336 (Tex. App.—Fort Worth 2008, no pet.) (noting that in appropriate cases, legal and factual sufficiency are relevant factors in assessing whether the trial court abused its discretion). "We view the evidence in the light most favorable to the probate court's decision, and an abuse of discretion does not occur when the court's decision is based on conflicting evidence." *In re Guardianship of Laroe*, No. 05-15-01006-CV, 2017 WL 511156, at *5 (Tex. App.—Dallas Feb. 8, 2017, pet. denied) (mem. op.) (reciting and applying this principle in context of never-married parents' ongoing battle over guardianship of disabled adult daughter).

When our review is for abuse of discretion, findings of fact and conclusions of law help us review the propriety of the trial court's ruling by providing us with an

14

explanation for the ruling. *In re J.P.C.*, 261 S.W.3d at 336–37. But "fact findings are not necessary when the matters in question are not disputed." *Barker v. Eckman*, 213 S.W.3d 306, 310 (Tex. 2006) (citing *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1971)).

## Issues

In six issues,[10] Mother and Father argue that the probate court abused its discretion by: (1) not finding that Noelle is totally incapacitated; (2) not finding that it is in Noelle's best interest to have Mother and Father appointed with full authority as her guardians; (3) not finding that Noelle's rights or property will be protected by the appointment of a guardian with full authority; (4) not finding that alternatives to guardianship that would avoid the need for the appointment of a guardian with full authority have been considered and are infeasible; (5) not finding that supports and services available to Noelle that would avoid the need for the appointment of a guardian with full authority have been considered and are infeasible; and (6) concluding that the CME, the treating physician's affidavit, and the parents' testimony are not probative evidence.

The ad litem representing Noelle on appeal distilled the issues into one: Did the probate court abuse its discretion in partially granting the parents' application and

---

[10]Mother and Father raise a seventh and final issue complaining that the probate court incorrectly issued findings and conclusions that related to matters occurring after the court rendered judgment. We will not consider this issue, though, because we need not address extraneous findings and conclusions that would not form a ground for reversal, even if erroneous. *See* Tex. R. App. P. 44.1, 47.1.

appointing them as permanent guardians of Noelle's person with limited authority? Because that is the fundamental issue before us, we will consider all six of the appellants' issues together under this overarching question.

## Discussion

### 1. Applicable Estates Code provisions

A guardianship over an incapacitated person should be tailored based on the person's "actual mental or physical limitations and only as necessary to promote and protect the well-being of the incapacitated person." Tex. Est. Code Ann. § 1001.001(a). If creating a limited guardianship, the court must design it to "encourage the development or maintenance of maximum self-reliance and independence in the incapacitated person, including by presuming that the incapacitated person retains capacity to make personal decisions regarding the person's residence."[11] *Id.* § 1001.001(b). As relevant here, an "incapacitated person" is an adult who, because of a physical or mental condition, is substantially unable to provide food, clothing, or shelter for herself; care for her own physical health; or manage her own financial affairs. *See id.* § 1002.017(2).

---

[11]By removing Noelle's right to decide her residence, the probate court implicitly held that this presumption had been overcome and that Noelle lacked capacity in that regard. At the same time, the probate court allowed Noelle to retain her right to decide on marriage, which would seemingly extend to deciding where to live if she did get married; but under the limited-guardianship order, Noelle has the right to do one but not the other.

16

Under the Code, the probate court could not establish a guardianship of the person for Noelle unless it found by clear and convincing evidence that:

- Noelle is an incapacitated person;

- it is in Noelle's best interest to have the court appoint someone to be her guardian;

- Noelle's rights will be protected by the appointment of a guardian;

- alternatives to guardianship that would avoid the need for the appointment of a guardian have been considered and determined not to be feasible; and

- supports and services available to Noelle that would avoid the need for the appointment of a guardian have been considered and determined not to be feasible.

*See id.* § 1101.101(a)(1)(A)–(E).

The probate court was further required to find by a preponderance of evidence that—among other things not at issue here—Noelle either (i) is totally without capacity to care for herself and to manage her property, or (ii) lacks the capacity to do some, but not all, of the tasks necessary to care for herself or to manage her property. *See id.* § 1101.101(a)(2)(D)(i), (ii). When a court opts for (ii), it must further "specifically state whether the proposed ward lacks the capacity, or lacks sufficient capacity with supports and services, to make personal decisions regarding residence, voting, operating a motor vehicle, and marriage." *Id.* § 1101.101(c).

"Alternatives to guardianship" are listed in Section 1002.0015 and include such things as executing a medical power of attorney, appointing an attorney in fact or agent

under a durable power of attorney, establishing a joint bank account, and the like—alternatives that presuppose one's having sufficient contractual capacity to enter into such arrangements. *See id.* § 1002.0015(1)–(9). "Supports and services" are those formal and informal resources and assistance that enable someone to (1) meet one's needs for food, clothing, or shelter; (2) care for one's physical or mental health; (3) manage one's financial affairs; or (4) make personal decisions about residence, voting, driving, and marriage. *See id.* § 1002.031.

The Estates Code also requires that "[a] determination of incapacity of an adult proposed ward . . . must be evidenced by recurring acts or occurrences in the preceding six months and not by isolated instances of negligence or bad judgment." *See id.* § 1101.102.

### 2. The evidence at the hearing and in the probate court's file

The probate court admitted without objection Dr. Nagireddy's statutorily compliant CME, in which Dr. Nagireddy opined on Noelle's need for a guardian. *See id.* § 1101.103. In her separate affidavit, Dr. Nagireddy stated among other things that she might decline to treat Noelle in the future due to Noelle's inability to give informed consent, and she offered her opinions of Noelle's total incapacity; inability to consent to certain decisions and services; absence of supports and services that would enable Noelle to (among other things) make personal decisions about residence, voting, driving, or getting married; and Noelle's susceptibility to abuse and exploitation without a guardian to make decisions on her behalf.

18

Concurring with Dr. Nagireddy's assessment, Father testified that Noelle is totally incapacitated and cannot make decisions for herself even with assistance, could not consent to a medical procedure even if someone explained it to her, and is not able to consent to employment. Noelle does not have the capacity to execute a power of attorney or supported decision-making agreement and would not understand such a document even if it were explained to her. Father had considered guardianship alternatives and supports and services, but Noelle's condition made them "not workable." When Noelle goes along with something she is told to do, it is because Noelle is a "passive participant" who does not fully understand what she is consenting to. Somewhat relatedly, Noelle cannot independently vote without undue influence according to Father. Father feared that Noelle would be vulnerable to exploitation without a guardianship. Mother testified that she had heard and agreed with Father's testimony.

The probate court had in its file Shorter's Initial Court Visitor's report, and because the Estates Code mandates such a filing, *see id.* § 1054.104, we presume that even though it was not put into evidence at the hearing, the probate court reviewed it. *Cf. In re Guardianship of Parker*, 275 S.W.3d 623, 629 (Tex. App.—Amarillo 2008, no pet.) (noting that because physician's letter or CME is statutorily required to be presented to the court, it would be reasonable to conclude that "the legislature intended the court to consider the contents of the letter or certificate" even if not formally admitted as exhibit). The report stated that Noelle does not understand guardianship and is

19

incapacitated; supports and services "were considered and were not sufficient"; alternatives to guardianship "were considered but were not feasible"; and Noelle needs a guardian and would consent to one. According to Shorter, and consistent with the CME, Noelle needs a guardian to make placement, medical, and financial decisions, and, like Dr. Nagireddy, Shorter recommended that Noelle's rights to drive, vote, dispose of property, and marry should be removed.

At the hearing, Shorter briefly summarized her report and agreed with the attorney ad litem that "we need a guardianship" for Noelle. Neither applicants' counsel nor the probate court asked Shorter anything.

Noelle was able to answer questions about her job the previous summer and about things she enjoyed doing; she expressed a desire for her parents to be her guardians because she was not capable of doing things without her family. As the probate court noted, Noelle "admitted not understanding everything" at the hearing.

> **3. Noelle's parents satisfied their statutory burden of proof for a full guardianship, and there was no conflicting evidence that justified a limited guardianship.**

> **A. The interplay between Section 1101.101's evidentiary standards and uncontested guardianship proceedings**

This case presents us with a novel question: if a guardianship is uncontested, to satisfy the "clear and convincing" standard must applicants nonetheless put on their evidence as though the proceeding is adversarial and subject to the usual prohibitions against seemingly conclusory testimony in the form of answers to leading questions?

*See, e.g., Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994) (explaining that clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established). As we will explain, our answer to that question is no.

Although the guardianship proceeding was uncontested, the probate court's legal conclusions included a statement that "[s]o long as an answer is filed, a guardianship is not 'uncontested.'" It's true that a general denial puts the onus on any plaintiff or applicant to prove his or her case, but Noelle's parents' application did not become "contested" merely because the attorney ad litem filed a general denial. *See Lesley v. Lesley*, 664 S.W.2d 437, 439 (Tex. App.—Fort Worth 1984, no writ) (noting, in guardianship case, that "[a] probate matter is contested when the pleadings on file demonstrate that the parties to the suit have adopted adversary positions"); *see also Contested Hearing*, Black's Law Dictionary (10th ed. 2014) (defining term as "[a] hearing in which at least one of the parties has objections regarding one or more matters before the court"). Because everyone who had cared for or evaluated Noelle—whether as parent, physician, court visitor/investigator, or attorney ad litem—all concluded that a full guardianship was necessary, it is most accurate to describe the proceeding as uncontested.[12]

---

[12]This view finds further support in the fact that even though Link had been appointed as Noelle's attorney ad litem on October 4, 2018, her handwritten general denial was not filed until March 22, 2019, shortly before the hearing began that same day, indicating that it was simply a housekeeping matter and not designed to create an

When the need for a full guardianship is uncontested, the requisite levels of proof are, in a sense, front-loaded by the Estates Code, beginning with the fact that the CME requirement obviates the need for live testimony from a physician (or even, it seems, for an accompanying affidavit). *See* Tex. Est. Code Ann. § 1101.103(b). One can quarrel with the notion that a physician is qualified to opine on the "degree . . . of the proposed ward's incapacity," including capacity to vote or drive or get married, but through the Estates Code, the legislature has seen fit to have medical doctors do just that. *See id.* § 1101.103(b)(1)(C), (D) (CME must address, among other things, the proposed ward's functional deficits (if any) regarding the ability to operate a motor vehicle and "make personal decisions regarding residence, voting, and marriage"). The CME form

---

adversarial posture. In a comprehensive ad litem manual that a great many Texas probate courts provide as a resource on which to rely, retired Judge Steve M. King advises attorneys ad litem about filing an answer as follows:

It's generally difficult to convince the court to order payment for a lawyer if no one ever appeared on behalf of the client.

File at least a general denial to the application to properly join issues. (Appendix M) However, if you are actively contesting the application, it would be even better to file an answer that states whether the Proposed Ward objects to the guardianship, the proposed guardian, or both, and send a copy to the court investigator. (Appendix N)

. . .

If no answer has been filed at the time of the prove-up, there will be no prove-up.

Steve M. King, The Ad Litem Manual for 2018 for Guardianship & Heirship Proceedings in Texas Probate Courts 17–18 (rev. date June 2019).

promulgated under this section also asks physicians to specifically indicate whether the proposed ward's incapacity is total or partial.[13]

Under Section 1101.103(c), a probate court may appoint an independent physician to conduct an examination, but that seems to be the court's only avenue if it *sua sponte* finds fault with a CME. This makes sense: judges are not doctors and are not positioned to second-guess a medical evaluation by picking and choosing among some but not others of *uncontested* CME findings.

And by allowing contests to guardianship proceedings, *see id.* § 1055.001(a)(2), the statutory scheme strikes a balance between safeguarding against a proposed ward's being railroaded into an unnecessary guardianship—either altogether or in its scope— and allowing a streamlined proceeding when all constituencies are unanimous in their recommendations. This is particularly true considering that two of those constituencies, the court visitor/investigator and the attorney ad litem, work for or are appointed by the probate court and are wholly independent of the guardianship applicants and their wishes.

Because of the often time-sensitive need to create legal protections for a proposed ward, in our view an uncontested proceeding allows the clear and convincing

---

[13]Although another part of the Code, Section 1101.053(c), provides that "findings and recommendations contained in the medical, psychological, and intellectual testing records are not binding on the court," that section deals with "records," which are not the same as a CME. *Compare id.* § 1101.053 *with id.* § 1101.103.

23

evidence called for by Section 1101.101(a)(1) to be "baked in" through the CME and a court visitor's report (or court investigator's findings), along with the attorney ad litem's critical prehearing role in ensuring that proposed wards' rights are not compromised nor their autonomy wrongly restricted.[14] If clear and convincing evidence in its more usual adversarial sense—requiring a factfinder to weigh and resolve conflicting evidence—were necessary in uncontested guardianship proceedings, they would become unwieldy and protracted, perhaps even requiring physicians to testify in person. Instead, uncontested proceedings should ideally be smooth and expeditious. Indeed, the latter goal is apparent in a variety of Texas counties whose courts have promulgated checklists and other procedures for setting guardianship proceedings on the uncontested docket.[15]

---

[14]We emphasize that our view concerns uncontested proceedings only.

[15]For example, in Travis County's form, the applicant's attorney is required, among other things, to confirm that the ad litem agrees that the case does not have any contested issues regarding the proposed ward's incapacity or regarding the scope of the guardianship; that the CME has been filed and "clearly supports the scope" of the guardianship being sought; that nothing in the file suggests that less restrictive alternatives might be available; that the case has no contested issues regarding the applicant's suitability to serve as guardian; that except for the proposed ward, everyone required to be served by the Estates Code has filed a waiver; and that the case can be heard in no more than 15 to 20 minutes. *See* https://www.traviscountytx.gov/ images/probate/Docs/uncontested-guardianship-docket-procedures.pdf (last visited Dec. 3, 2020). Grimes County uses essentially the same form for its uncontested-guardianship docket. *See* https://img1.wsimg.com/blobby/go/9bf95e49-62ee-4653-980d-bb042b589c74/downloads/Setting%20Request%20Uncontested%20 Guardianship%20Docke.pdf?ver=1553207108134 (last visited Dec. 3, 2020). Bexar County has its own uncontested-guardianship checklist, which does not appear to contemplate much in the way of live testimony to satisfy Section 1101.101's evidentiary

Moreover, the Estates Code provides that "[t]he rules relating to witnesses and evidence that apply in the district court apply in a guardianship proceeding *to the extent practicable.*" *Id.* § 1055.101 (emphasis added). We take it that this flexibility exists in part to accommodate expedited uncontested proceedings when appropriate.

Whether the Estates Code embodies the clearest and wisest of procedures is not the question before us, and we of course do not suggest that a probate court must simply rubber-stamp an uncontested guardianship and its agreed-upon scope. A probate court can always order an independent medical examination and appoint the necessary physicians on its own motion. *See id.* § 1101.103(c); *see also* King, The Ad Litem Manual for 2018, at 23 ("If the court determines it is necessary, or if the ad litems or a contestant wants a 'second opinion,' the court may order an [IME] and appoint the necessary physicians."). And, certainly, a probate court that senses mischief afoot or even just a lax process can—and should—closely question not only the applicants but also any court personnel or ad litems who seem to be rolling over or paying insufficient

burdens. *See* https://www.bexar.org/DocumentCenter/View/25977/Uncontested-Guardianship-Docket-Procedures (last visited Dec. 3, 2020). Harris County Probate Court No. 4 sets uncontested guardianships for a set time every Wednesday morning, with streamlined checklist and final-hearing procedures. *See* https://probate crt4.harriscountytx.gov/pages/Dockets.aspx & https://probatecrt4.harriscounty tx.gov/Documents/Requirements%20to%20Attorney%20Application%20for%20Gu ardianship%20and%20Attorney%20Check%20List%20for%20Final%20Hearing.pdf (last visited Dec. 3, 2020). Ellis County's guide to guardianships seems similarly designed for expeditious proceedings. *See* http://co.ellis.tx.us/ DocumentCenter/View/6582/Guardianship-Guide?bidId= (last visited Dec. 3, 2020).

attention to their duties (if not replace them with someone else). But here, because the probate court did not ask any questions of the court investigator or ad litem, we assume that their impartiality, thoroughness, and attentiveness were not in doubt.

### B. The evidence was not conclusory and thus was probative.

One of the probate court's central legal conclusions was that Mother's and Father's testimony and Dr. Nagireddy's affidavit were not probative evidence of Noelle's need for a full guardianship and could thus be disregarded.

### i. Father's and Mother's responses to leading questions

The probate court determined that "[c]onclusory questions without expansive answers are not competent evidence," citing specific pages and lines of Father's and Mother's testimony that, in the court's view, constituted "bare conclusions that were factually unsubstantiated and, therefore, did not constitute probative evidence."[16] Every question within the cited pages was a leading one, eliciting a simple yes (or the occasional no). Presumably because the hearing bore all the hallmarks of the uncontested proceeding it was, the attorney ad litem never objected on that or any other basis.

---

[16]The probate court identified only two questions put to Mother as yielding factually unsubstantiated and thus nonprobative responses: "And you believe you are qualified and not disqualified to serve as guardian of the person of your daughter. Is that correct?" "If I ask you those same questions [as put to Father], or they ask you those same questions, would your answers be substantially the same?" Regarding the first question, the probate court nonetheless concluded that Mother was "not disqualified" under the Code and appointed her accordingly.

26

The questioning on direct examination established first that Father was familiar with Dr. Nagireddy and had reviewed her CME and then guided Father through the findings and recommendations in the CME and in Dr. Nagireddy's accompanying affidavit. This questioning tracked every finding the Estates Code requires before a full guardianship can be ordered. *See id.* § 1101.101.

Another of the Code-required findings, one that falls outside a CME, was also elicited through a leading question and is part of the testimony that the probate court determined to be factually unsubstantiated and thus nonprobative: "And you have observed evidence of incapacity by recurring acts or occurrences within the preceding six-month period that are not isolated instances of negligence or bad judgment. Is that correct?" This element is necessary for determining incapacity in an adult proposed ward. *See id.* § 1101.102. Although disapproving of this leading question and Father's affirmative response as conclusory, the probate court nevertheless made this finding in both its limited-guardianship order and its findings of fact and conclusions of law.

One-word answers to leading questions are not necessarily improper on direct, nor are they the same as bare conclusions lacking factual support, in at least three situations. First, in a prove-up hearing, a trial court may properly allow leading questions that track the language of a statute when doing so fits the statute's purpose.[17] *See*

---

[17]In practice, leading questions are how attorneys routinely have their clients prove up such things as uncontested divorces, getting a will admitted to probate, etc.— leading questions are highly efficient. We recognize, of course, that divesting a person of rights through a guardianship is a serious undertaking; that is why the law requires

*Crittenden v. Crittenden*, No. 04-99-00933-CV, 2001 WL 356993, at *1 (Tex. App.—San Antonio Apr. 11, 2001, pet. denied) (rejecting appellant's claim of trial-court error in allowing appellee to "prove up his case through his response to a single leading question"; trial court has discretion to allow leading questions and did not abuse its discretion "when it allowed [appellee] to answer 'yes' to a question tracking the language of the no-fault statute"); *see also In re H.K.A.*, 07-07-0008-CV, 2007 WL 1660699, at *1 (Tex. App.—Amarillo June 8, 2007, no pet.) (mem. op.) (holding that trial court's finding on managing conservatorship was consistent with testimony, much of which was elicited by leading questions tracking statutory language). Second, facts contained in leading questions can find their support in other, properly admitted evidence. *See First Cont'l Real Estate Inv. Tr. v. Cont'l Steel Co.*, 569 S.W.2d 42, 45–46 (Tex. App.—Fort Worth 1978, no writ) (upholding trial court's overruling of leading objection when question's answer was cumulative of other evidence); *see also Owens-Corning Fiberglas Corp. v. Malone*, 916 S.W.2d 551, 568 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (Tex. 1998) (holding no need to decide whether trial court abused its discretion by allowing leading questions; appellant could not show harm because the testimony elicited through leading questions was cumulative of other, properly admitted evidence). Third, if the facts recited in a leading question are undisputed, the question is proper.

---

that physicians, court visitors or investigators, and ad litems be involved. But the gravity of such a proceeding does not mean that the requisite proof cannot be put into evidence the way it was in this case.

*See Roberts v. Capitol City Steel Co.*, 376 S.W.2d 771, 777 (Tex. App.—Austin 1964, writ ref'd n.r.e.) (observing that leading a witness by stating undisputed facts in the questions is proper).

Thus, if the facts recited in the (unobjected-to) leading questions that were put to Father (1) walked him through the requisite statutory findings in an uncontested hearing; (2) find support in other, properly admitted evidence; or (3) are undisputed, we will conclude that Father—and, by extension, Mother—provided probative evidence to support a full guardianship of Noelle due to her total incapacity. And so we do: the guardianship hearing was uncontested; Dr. Nagireddy's CME was properly admitted and was admitted without objection; and the attorney ad litem and court investigator did not dispute the statutory facts to which Father acceded.

For any or all of those reasons, Father's and Mother's testimony was not factually unsubstantiated or conclusory and was thus probative of whether Noelle needed a full guardianship.

### ii.    Dr. Nagireddy's affidavit

The probate court also determined that Dr. Nagireddy's affidavit contained conclusory legal opinions that she was not qualified to render. The Estates Code does not require a physician's affidavit, only a CME or equivalent letter. *See* Tex. Est. Code Ann. § 1101.103.

Dr. Nagireddy's opinions in her affidavit generally matched and expanded on what the Code requires of a CME. *See id.* § 1101.103(b). A physician's opinions on such

29

matters might well overlap with legal opinions, but because the legislature has told physicians to render what are essentially legal opinions in the CME, we cannot agree that Dr. Nagireddy was unqualified to opine on the parallel matters contained in her affidavit. Additionally, no one objected to Dr. Nagireddy's qualifications, so those qualifications are not properly presented for our review, as the ad litem has conceded. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 143–44 (Tex. 2004).

As for whether the doctor's opinions constituted conclusory opinion testimony that was irrelevant under the rules of evidence, *see* Tex. R. Evid. 401, the Code does not require a physician's affidavit. Between Dr. Nagireddy's CME and the court-visitor report—both of which are statutorily required and are in the record—the fact of Noelle's total incapacity, and thus her need for a full guardianship, is undisputed even without the affidavit. In any event, the affidavit drew from Dr. Nagireddy's ten-year history of treating Noelle, as well as from having examined Noelle a month before the application was filed. Whether we consider the affidavit as one from an expert on the matters it discusses or from a lay witness with personal knowledge, and particularly because the CME was attached to the affidavit, we have little trouble concluding that Dr. Nagireddy's opinions were sufficiently tied to facts and thus not in the realm of the purely conclusory. *See Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006) (noting that a witness may be qualified to give testimony both under Texas Rule of Evidence 702 because of expertise and under Rule 701, if the witness's testimony and opinion are based on firsthand knowledge); *Vela v. Yamaha Motor Corp.*, No. 04-01-

00025-CV, 2002 WL 871838, at \*2 (Tex. App.—San Antonio May 8, 2002, no pet.) (not designated for publication) (same); John F. Sutton, Jr. & Cathleen C. Herasimchuk, *Article VII: Opinions and Expert Testimony*, 30 Hous. L. Rev. 797, 826 (1993) (Texas Rules of Evidence Handbook) (noting that a witness qualified as an expert "may testify to his [or her] personal knowledge of the facts in issue, in which case [the witness] testifies to opinions under Rule 701" or the witness may "evaluate specific data and facts in issue in light of [the witness's] experience in a particular specialized field, in which case [the witness] testifies to opinions under Rule 702"); *cf. City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) (holding that "if no basis for the [expert's] opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence" even if not objected to).

### C. Noelle's testimony did not create an evidentiary conflict that required a factfinder's resolution

In light of the undisputed and statutorily sufficient evidence that Noelle is totally incapacitated and needs a full guardianship without retaining any rights, including her rights to marry, vote, and drive, the probate court's basis for leaving her with those rights lies, if at all, in Noelle's own testimony, as the probate court's findings of fact and conclusions of law suggest. But Noelle's testimony did not demonstrate that the assessments of her parents, her doctor, and the court visitor were incorrect.

Noelle was able to attend and participate in the hearing, and perhaps sufficiently understood the difference between the truth and a lie to be competent to testify. She

31

was also able to express a desire to work or attend community college and left open the possibility of eventually living somewhere other than with her parents. Noelle stated that she appreciates her parents' help and guidance even though she does not always obey them. She attended school and took part in church activities and movie outings, as well as spent time with friends at her house. Noelle recalled her grocery-store job and mentioned her heart problem.

The probate court found that it was Noelle's decision to testify, although the record does not show one way or another whether that was the case. The court found that Noelle "makes decisions, she attends school and church on her own as well as church outings with people her age and without adult supervision." Other factual findings were that

> [Noelle] said she would never take drugs and indicated she knew they were bad for her. [Noelle] needs prompting, but performs her own activities of daily living which include some of her clothing and food. She has chosen to stay in her parents' home, her shelter. [Noelle] also had a job and wants to look for another job or take classes at [community college].

Based on these facts, the probate court found that although Noelle lacks the capacity to make personal decisions about medical care, employment, and residence, "there was not sufficient evidence presented that [Noelle] lacked the capacity, or sufficient capacity with, or without, supports and services, to make decisions regarding marriage, voting, and operating a motor vehicle." With regard to driving, the court further found that alternatives to removing that right existed and that Noelle was "not

32

entitled to operate a motor vehicle without fulfilling the requirements of Texas law pursuant to the Texas Department of Transportation."

But the evidence from Dr. Nagireddy, from the court-visitor's report and testimony, and from Noelle's parents unanimously recommended a full guardianship on the ground that Noelle is totally incapacitated and cannot make personal decisions including regarding residence, voting, operating a motor vehicle, and marriage.[18] *See* Tex. Est. Code Ann. §§ 1101.101(c), .103(b). In the absence of countervailing evidence that with (or without) supports and services Noelle is in fact capable of making significant decisions about voting, driving, and marriage—none of which she was asked about—the probate court abused its discretion by failing to find that Noelle is totally incapacitated, *see id.* § 1101.101(a)(2)(D)(i), and by failing to appoint a guardian with full authority, *see id.* § 1101.151.

We sustain Appellants' first six issues.

## Conclusion

In this uncontested proceeding, the uncontroverted, probative evidence established that Noelle is totally incapacitated and needs a guardian with full authority and that her parents are qualified to assume that role. To be sure, we applaud the probate court's desire to zealously guard a person's constitutional and other rights to

---

[18]Of these four statutorily grouped personal decisions, Noelle testified only about possibly changing her residence down the road; that was the one personal decision that the probate court held she lacks capacity to make, with or without supports and services.

33

the greatest possible extent, but here the statutory burdens for a full guardianship were satisfied according to the Estates Code.

Having sustained Appellants' issues one through six, which are dispositive, we reverse the probate court's denial of Mother's and Father's application to be appointed guardians of Noelle's person with full authority. We remand this case to the probate court so that it can render an order consistent with this opinion and with Estates Code Section 1101.151.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  December 10, 2020