# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00365-CV

---

**Quyen Lee, D.D.S., Appellant**

**v.**

**Travis Hawkins and Yolanda Hawkins, Appellees**

---

### FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 20-0283-C26, THE HONORABLE SCOTT K. FIELD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Quyen Lee, D.D.S., appeals from the trial court's final judgment rendered on the jury's verdict finding Dr. Lee liable for medical malpractice and awarding Travis and Yolanda Hawkins damages for injuries sustained by Travis. On appeal, Dr. Lee challenges the trial court's admission and exclusion of evidence, the legal and factual sufficiency of the evidence to support the verdict, and the trial court's communications with the jury. For the following reasons, we affirm the trial court's judgment.

## BACKGROUND

Two days after Travis underwent a surgical wisdom-tooth extraction by Dr. Lee, he suffered a stroke. The extraction occurred during the morning of Friday, September 21, 2018, and the stroke occurred late in the evening of Sunday, September 23, 2018. Travis was fifty-nine years old when the stroke occurred. He has atrial fibrillation (A-Fib), which has been managed

for several years by an anticoagulant medication, Xarelto, that he takes every evening pursuant to the recommendation of his cardiologist, Dr. Javier Eduardo Banchs. However, Travis stopped taking his Xarelto after his evening dose on September 18, 2018, pursuant to Dr. Banchs's instruction to stop the medication forty-eight hours before the procedure. Travis did not resume taking the Xarelto until the late evening hours of September 23, 2018, after he had started experiencing visual disturbances. His Sunday evening stroke was confirmed the next day after he went to the emergency room.

The Hawkinses sued Dr. Lee, Dr. Banchs, and Scott & White Memorial Hospital—where Dr. Banchs is employed—for their alleged negligence in proximately causing Travis's stroke and the resulting damages that he and Yolanda suffered. The jury trial took place over eight days in January 2024. The evidence is conflicting as to what instruction, if any, Travis received from Dr. Banchs and Dr. Lee concerning when he should resume taking his Xarelto after the extraction. However, before we summarize the relevant evidence, we recount the trial court's communications with the jury that Dr. Lee challenges on appeal.

***The trial court's off-the-record discussion with the jury***

On the first day of trial, before the Hawkinses' case in chief, the trial judge dismissed a seated juror following additional voir dire regarding her late-disclosed inability to remain unbiased. The juror's dismissal left the empaneled jury without an alternate for the remainder of trial. After the voir dire and excuse of the juror, the trial judge addressed the parties and their attorneys, outside the presence of the jury:

> Obviously we are in a difficult situation because the 12 need to stay together for the rest of this time.

2

I am going to give a bit of a stern warning to the remaining jurors that this is not their get out of jail free card. In fact, it may be the opposite.

I do want to clarify this for clients. The last thing I want is the Hawkins to think that they're not going to get a fair trial because I have a dentist and doctor son and daughter-in-law.[1] My wife was also the victim of malpractice at MD Anderson, so whether that weighs at all, I don't know, but full disclosure, which I'm very big on at this moment. So give me a chance to do that. I'm going to at least explain why we have someone going home. I'm going to be very guarded in my comments, I promise, other than making sure they understand I'm done with jurors playing games, and we are going to do everything we can to keep them together and finish this trial. All of your clients deserve that.

The record then indicates a seven-minute recess, during which time the trial judge departed the courtroom, spoke in private with the jury, and returned to the courtroom to speak with the parties and their attorneys. The substance of the trial judge's conversation with the jury is not in the record, but afterwards the trial judge spoke on the record summarizing for the parties and their attorneys what he had told the jury:

I have spoken to the jurors. I just explained to them what has happened, why there's now 12 of them instead of 14. I was very honest with them about that, and I told them don't ask to go home, because unless it's, like, a dire emergency, you're not getting out of jury service.

They actually—the reaction just—of course they didn't vocalize, but just in their faces and everything else—because I told them, "Look, the plaintiffs and the defendants both need closure. This case has been pending a long time. Because of COVID, a lot of things are behind. And that's the beauty of our justice system is that people get closure, good or bad."

I got a lot of head nods, affirmative looks. And I said, "Can everybody commit to me you're going to be here these two weeks and do your very best?" And every single one of them responded affirmatively, so hopefully no sickness.

---

[1] The trial judge had previously mentioned his dentist son and daughter-in-law doctor during the voir dire of the dismissed juror.

3

Then jury was called back in, and trial proceeded with the plaintiffs' calling their first witness and expert, Dr. Roger Byrne, DDS, MD.

***The trial court's announcement to the jury of Dr. Banchs's settlement***

Over the lunch break on the second day of trial, Dr. Banchs and Scott & White settled with the plaintiffs. After the jury was brought back in from lunch, the trial court stated,

> Please be seated. Welcome back. I hope you had a good break. We did go a little longer than I told you we would, as happens, but in this case I have what I can only describe as good news for you, which is, if you noticed, the room has changed a little bit. We have one less defendant than we used to.
>
> Over the lunch hour, part of the case was settled. Dr. Banchs is no longer in the case, which means—I can't tell you exactly what that means yet, because the lawyers themselves don't know because it's new news to them, too, but I can say that the trial just got shorter. It definitely did not get longer. If that means a day—I don't know, timewise, what that means, but rest assured—I already promised you we wouldn't go past ten days. It shouldn't be even that now.

This statement was made in the middle of Dr. Lee's cross-examination of Dr. Byrne, after which the cross-examination resumed and the trial against Dr. Lee continued.

***Relevant testimony***

The parties offered conflicting evidence, including testimony from various experts, concerning the dispositive evidentiary issues on appeal: responsibility for and causation of Travis's injuries, the communications made to him about when he should restart his Xarelto, and the standards of care applicable to Dr. Banchs and Dr. Lee and whether such standards were breached.

Dr. Byrne—a dentist, oral and maxillofacial surgeon, and plastic surgeon who also happens to have A-Fib and takes Xarelto to manage it—testified that he has specialized

4

knowledge about the standard of care for dentists like Dr. Lee. Dr. Byrne testified that prior to tooth extractions, it may be necessary to direct the patient to halt the use of Xarelto, depending on the number of extractions and the risk of a high level of bleeding during the procedure. Dr. Byrne explained to the jury that Travis's records demonstrated that the "problem" wisdom tooth he had (No. 1) was a "simple extraction" (i.e., pulling out the tooth without an incision) that would not have required surgery and that Dr. Lee should have planned for a simple extraction, resorting to a surgical extraction only if the tooth turned out to be more difficult to remove than it appeared. As a result of Dr. Lee's decision to make the procedure surgical, it took nearly an hour rather than a "matter of minutes."

Dr. Byrne testified that before the dental procedure, Travis informed Dr. Lee that he was taking Xarelto and that his treating cardiologist was Dr. Banchs. Dr. Byrne testified that Dr. Lee did not talk to Dr. Banchs or anyone at Dr. Banchs's office but did send Travis over to Dr. Banchs's office with a medical-clearance form for the cardiologist to sign. Dr. Byrne testified that Dr. Lee, as the surgeon, was responsible for Travis's care after the surgery and "should know when to restart" the Xarelto and that, if she did not know, she should have "refer[red] it to somebody who does." However, Dr. Lee did not know or discover when Travis should restart his medication, and she did not inform Travis when he should restart it, which was "below the standard of care." Dr. Byrne explained that there was no "clearly documented anticoagulant management plan for Travis, including . . . when do you restart it" in Travis's dental records before the tooth extraction, which was also below the standard of care.

Dr. Byrne testified that it is "the surgeon's call when to consider restarting [the Xarelto] when the bleeding has stopped." Dr. Lee performed the surgery on a Friday and did not see or communicate with her patient again until Monday, even though she knew he had last taken

5

his Xarelto the Tuesday evening before the surgery. Dr. Byrne testified that the surgery should not have been scheduled for a Friday because it was Dr. Lee's "job to check the patient the next morning to see if the bleeding has stopped. If it has, then [Travis] can automatically restart his Xarelto." Dr. Lee "didn't tell [Travis] when to restart" his Xarelto. Instead, she told him to restart it "when it stops bleeding," but that "puts the onus on the patient's back and says, you determine when it stops bleeding and then you go back on. Well, that's not his job. It's her job to tell him." Dr. Byrne explained that it was not Travis's job to determine "when he has clotted enough" to go back on his medication; instead, it was Dr. Lee's job as the surgeon.

Dr. Banchs, Travis's treating cardiologist at the time of the stroke, testified that he is a medical director at Scott & White who has administrative duties related to that position but also sees patients regularly. Half of his practice is A-Fib, and he "pretty much every week" advises patients like Travis on whether and when to stop and restart taking blood thinners. He confirmed that Xarelto is a blood thinner, also known as an anticoagulant. Travis began seeing Dr. Banchs in 2016 "for the management of his atrial fibrillation and his medication related to atrial fibrillation." Dr. Banchs described Xarelto as a medication "you can take once a day [that] inhibits the clotting factors [in blood] and prevents the strokes." He instructed Travis to stop taking the Xarelto before the tooth extraction because the "problem with oral anticoagulants is that when you take them, you're at risk of bleeding." He explained that it is "common practice" to discontinue taking the blood thinner "temporarily" if the patient is going to "undergo a surgical procedure" that "involves the risk of bleeding." Dr. Banchs acknowledged that if the medication is stopped, the risk of stroke increases, and that for someone with the risk factors that Travis had, his risk of stroke from not taking Xarelto was 2%.

6

Dr. Banchs testified that his first contact with Dr. Lee was through a medical-clearance form that he received from Dr. Lee's office on July 16, 2018. Dr. Banchs explained that he signed the form and faxed it back to Dr. Lee the next day, indicating that Travis should stop taking his Xarelto for the surgical procedure Dr. Lee was planning to perform. However, he did not indicate anything on the form as to when the medication should be stopped and restarted.

Dr. Banchs testified that in the morning of September 19, 2018, Travis appeared at his medical clinic "wanting instructions about the anticoagulant and his dental procedure." Dr. Banchs was called to his clinic's front desk by his nurse and spoke with Travis. Dr. Banchs testified that although he does not remember Travis bringing a second medical-clearance form with him on that date, there must have been a second form, as "that's the standard communication," and because through the discovery process he learned that there had been a second form. Dr. Banchs testified that if there was a form, he had "no reason not to sign" it but that he believed the "most important [thing] was to give [Travis] the instructions and that's what [he] recollect[s] the most."

Dr. Banchs testified that he personally spoke with Travis on September 19 and told him to stop taking his Xarelto "48 hours" before the procedure. From Dr. Banchs's review of the records, he believed that Travis followed his instructions as to when to stop the Xarelto. Dr. Banchs testified that he told Travis to restart the Xarelto "as soon as there was proper clotting, that he wasn't bleeding." Travis wanted Dr. Banchs to give him a specific restart date, but Dr. Banchs told him, "I can't give you a date because I don't know when the surgery is, if it's going to be postponed or not, and I also didn't know if he was going to bleed or not." Dr. Banchs testified that his "habit and practice is to recommend [to patients] as soon as bleeding is controlled, as soon as there is proper clotting, you can restart right away."

7

Dr. Banchs testified that Xarelto is a "rapid onset drug," meaning that anticoagulation begins "within two to four hours" after a dose, which means that "if you are bleeding or there is any concern about bleeding and you take it immediately, you are going to be anticoagulated. You're going to continue bleeding. So I do explain to my patients you have to talk to your surgeon. Your surgeon has to tell you if you are bleeding or not, if you are properly clotting." Dr. Banchs clarified that with dental procedures, as testimony indicated the previous day, "the bleeding is evidence. You see the blood coming out. So I explained [to Travis] if you are bleeding, you cannot take it. If you are not bleeding, you take it right away after the procedure." Dr. Banchs believed that he gave clear instructions to Travis about when to stop and restart the Xarelto and that Travis understood his instructions. Although Dr. Banchs did not remember a second medical-clearance form, he testified that "90 percent of the time" when a patient asks when he should restart Xarelto he replies, "ASAP, which means as soon as possible." Dr. Banchs believed that if he "wrote something on that form, it would be ASAP or whenever clotting stops, but it's a lot faster and quicker and easier to write ASAP." After Dr. Banchs spoke with Travis on the morning of September 19, he did not have any further communication with Travis about when to stop and restart the Xarelto.

Dr. Lee testified that the first medical-clearance form completed and faxed back to her office from Dr. Banchs's indicated that Travis should stop taking his Xarelto but did not specify when he should stop taking it before surgery or when he should restart. Because that information had not been included, Dr. Lee's office rescheduled Travis's surgery date for September and asked him to take a second medical-clearance form to Dr. Banchs's office for completion. Dr. Lee testified that the second form Travis brought back had been completed by Dr. Banchs's office and this time specified both a stop date (forty-eight hours before surgery)

8

and a restart date, but she did not recall what was written for the restart date. During her testimony, Dr. Lee was asked if she remembered that she had previously testified in her deposition that she could not recall whether any restart date was indicated on that form.

Dr. Lee confirmed that there is nothing in her dental records for Travis, as of the day of the surgical extraction, indicating when he should have restarted the Xarelto after the surgical extraction. Dr. Lee testified that Travis had told her, prior to the surgery, that Dr. Banchs had told him to restart the Xarelto "when he clotted properly." She testified that Travis should have been able to determine, just as well as she could, whether he could taste blood and whether a clot had formed at the extraction site. Dr. Lee admitted that she did not tell Travis when to restart his Xarelto.

Dr. Lee sent Travis home with a standard, pre-printed post-op instruction sheet. The sheet indicated,

> **DO NOT DISTURB THE AREA:** For the next few days, and especially the first 24 hours, it is very important to allow your body to form a good clot and start the natural healing process. Swishing, sucking through a straw, and smoking can all dislodge the clot. Keep anything sharp from entering the wound (crunchy food, toothpicks, eating utensils). Be sure to chew on the opposite side for 24 hours.

> **BLEEDING:** When you leave the office, you might be biting on a gauze pad to control bleeding. Keep slight pressure on this gauze for at least 30 minutes. Don't change it during this time; it needs to remain undisturbed while a clot forms in the extraction socket. After 30 minutes you may remove it. You may bite on another moistened gauze or a tea bag for another 30 minutes if you feel it is still bleeding. Small amounts of blood in the saliva can make your saliva appear quite red. This is not uncommon and may be noticed the rest of the day after the procedure.

When Dr. Lee saw Travis on Monday morning, September 24, she advised him to go to the emergency room because she believed, based on what he'd told her about his visual disturbances

9

and symptoms the night before, that he might have had a stroke. Dr. Lee confirmed that she did not document her notes from Travis's surgery until almost midnight on Monday. She wrote in her notes, "Patient stopped taking Xarelto per cardiologist 48 hours prior to extraction procedure," and "Per patient advised by cardiologist to confirm that No. 1 extraction site clotting properly to continue Xarelto."

Travis testified that he took the second medical-clearance form to Dr. Banchs's office and asked that it be completed. After one of Dr. Banchs's nurses—Nurse Washek—took the form to the back office and then returned it to him, it indicated only when to stop the Xarelto (forty-eight hours before the surgery) but not when to restart it. He inquired about that, and Washek told him that the restart date is "up to your dentist." When Travis pressed Washek for a more definite restart date, explaining that Dr. Lee is not a cardiologist, Washek told him that Dr. Lee would have to do her "homework." Travis pressed Washek further because he recognized that the surgery would be on a Friday and he was not sure when he would see Dr. Lee again. He asked Washek, "how long can I go" without taking the Xarelto? Travis testified that Washek told him, "I've seen people with your kind of A-fib go for months with no trouble off of Xarelto at all." Travis decided to let the issue go, because he knew and trusted Washek. Contrary to Dr. Banchs's testimony, Travis denied speaking with or seeing Dr. Banchs on the day he took the second medical-clearance form to Dr. Banchs's office; instead, he testified that he spoke only with Washek.

Travis testified that there was nothing written on the second medical-clearance form about when to restart the Xarelto; the form only specified when to stop the medication before the surgery. Travis then took the form to Dr. Lee's office. He recounted his conversation with Washek to Dr. Lee and gave the medical-clearance form to her. Then, after the surgery two

days later, Travis asked Dr. Lee, "So when do I restart my Xarelto?" Dr. Lee responded, "I'll see you Monday morning first thing," and Travis said goodbye and left.

### *The verdict and judgment*

The jury found that the negligence of both Travis and Dr. Lee proximately caused Travis's injury but that Dr. Banchs's negligence did not proximately cause the injury. The jury apportioned 75% of the responsibility for Travis's injury to Dr. Lee, 25% to Travis, and 0% to Dr. Banchs. The jury awarded Travis the following in damages: $62,500 for past physical pain and mental anguish; $62,500 for future physical pain and mental anguish; $218,875 for past loss of earning capacity; $335,267 for future loss of earning capacity; and $1,471,134.54 in future medical-care expenses. The jury awarded Yolanda $43,391.70 in loss of household services sustained in the past and $130,175.10 for future loss of household services.

In rendering judgment, the trial court added in pre-judgment interest on past damages and reduced each category of damages by 25% (for Travis's responsibility), resulting in the following total damages awards: $1,446,577.21 to Travis and $143,325.30 to Yolanda, plus post-judgment interest and court costs. Dr. Lee filed a motion for new trial and request for remittitur, which was denied by operation of law, and then perfected this appeal.

## DISCUSSION

Dr. Lee raises six issues on appeal. She contends that the trial court erred in admitting and excluding evidence (issues two and three) and had improper communications with the jury by announcing Dr. Banchs's settlement and by having the off-the-record discussion with the jury (issues one and four). In issue six, she contends that there is legally and factually insufficient evidence to support the jury's findings that she was negligent and that her negligence

11

proximately caused Travis's injury and that there is factually insufficient evidence to support the jury's allocation of no fault to Dr. Banchs. In issue five, she contends that the cumulative effect of multiple trial errors resulted in an unfair trial that requires reversal.

### *Admission and exclusion of evidence*

Dr. Lee argues in her second issue that the trial court abused its discretion in admitting exhibits 82, 83, and 85. *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998) (noting that standard of review for evidentiary rulings is abuse of discretion). Exhibit 82 is a one-page table offered during the testimony of Dr. Stan Smith (the plaintiffs' expert economist) summarizing his contemporaneous testimony about Travis's lost earning capacity due to the stroke. Exhibit 83, also offered during Dr. Smith's testimony, is a one-page table summarizing his contemporaneous testimony about the lost value of the household services that Travis can no longer perform due to his stroke. Exhibit 85 is a three-page chart offered during the testimony of Dr. Leigh Ann Levy, the plaintiffs' expert life-care planner, summarizing her opinions regarding the future medical-care expenses that Travis will have due to his stroke.

The trial court does not abuse its discretion in matters of evidence "if there is any legitimate basis for the ruling." *Id.* Moreover, "[e]rroneous admission of evidence requires reversal only if the error probably (though not necessarily) resulted in an improper judgment." *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). Dr. Lee objected to exhibits 82 and 83 on the grounds of hearsay and that they were summaries of voluminous writings for which the proper predicate had not been laid. *See* Tex. R. Evid. 801, 1006. However, the tables in exhibits 82 and 83 depict the same data that Dr. Smith had just discussed for the jury while the table was being shown to them as part of his testimony. For instance, Dr. Smith testified that

12

when Travis is age 77, his estimated cumulative earnings since his stroke would have been $1,209,575, which is the same number for that age as depicted on the exhibit 82 table that was admitted. Because Dr. Smith testified as to the same information as that depicted in the tables, the tables were not hearsay but instead written expressions of the very testimony he was contemporaneously providing. *Cf. id.* R. 801 (defining "statement" and "hearsay"). Nor were the tables summaries of voluminous writings; instead, as Dr. Smith explained, they were the product of various calculations that he had performed based on life-expectancy information, salary research, inflation, taxes, and the difference between a person's earning "capacity" and his wages. *Cf. id.* R. 1006 ("Summaries to Prove Content"). There were, therefore, legitimate bases for the trial court's overruling Dr. Lee's objections.

Similarly, exhibit 85 was shown to the jury while Dr. Levy testified about its individual components. After Dr. Levy specifically testified about the different categories of future medical and life-care expenses and the dollar amounts she had estimated for each, the plaintiffs' attorney offered the exhibit for admission. Dr. Lee first argues on appeal that exhibit 85 was improperly admitted under Rule 901 because it was not "properly authenticated." However, Dr. Lee does not explain how Rule 901's requirements were not met, instead arguing that the numbers contained therein "were offered as truth of the cost of Plaintiffs' future medical needs without any foundation or evidence of such needs." *See* Tex. R. Evid. 901 (providing that to authenticate item of evidence, proponent must "produce evidence sufficient to support a finding that the item is what the proponent claims it is," and that such authentication may occur through testimony of witness with knowledge "that an item is what it is claimed to be"). But Dr. Levy had just testified at length, without objection, about the additional diagnostic evaluations, treatments, medical equipment, and medications that Travis will likely require as a

13

result of his stroke. We disagree with Dr. Lee that the exhibit was not properly authenticated under Rule 901 or was not supported by evidence of Travis's future needs.

Dr. Lee also argues that exhibit 85 should not have been admitted because it likely confused and misled the jury because the numbers contained in the table did not "accurately reflect the present-day value of the goods and services."[2] But Texas law does not require specific evidence of the discount rate or that a party introduce evidence of present value because the jury is qualified to make the calculation based on its common knowledge of interest rates. *See Rangel v. Robinson*, No. 01-05-00318-CV, 2007 WL 625042, at *2 (Tex. App.—Houston [1st Dist.] Mar. 1, 2007, pet. denied) (mem. op.); *General Motors Corp. v. Burry*, 203 S.W.3d 514, 553 (Tex. App.—Fort Worth 2006, pet. denied). In personal-injury actions, the trier of fact must assess damages to accrue in the future on the basis of their dollar amount if they were presently paid in cash. *Rangel*, 2007 WL 625042, at *2. The jury was instructed to calculate all damage awards as a sum "if paid now in cash," and we must presume that the jury followed such instruction.[3] *See id.* We conclude that the trial court did not abuse its discretion in admitting exhibit 85. We overrule Dr. Lee's second issue.

In her third issue, Dr. Lee argues that the trial court abused its discretion by excluding from evidence the audio recordings of two phone calls made by Maria Gorostieta, an employee of Dr. Lee, to Travis and Yolanda to discuss the litigation after it was apparent that a lawsuit was imminent. Dr. Lee argues that in the phone calls, the Hawkinses admitted that they

---

[2] Dr. Lee also argues that the exhibit was inadmissible hearsay, but she did not preserve that issue because she did not object to the exhibit's admission on that basis.

[3] The jury awarded Travis $1,471,134.54, compared to the total of $2,754,108.79 to which Dr. Levy testified and that was depicted on the chart, indicating that the jury may well have discounted the amounts to present value.

14

believed Dr. Banchs, and not Dr. Lee, was the one responsible for Travis's injuries by giving him "remarkably bad advice" and that it was a surprise to the Hawkinses that their attorney was also suing Dr. Lee. Dr. Lee argues that these statements were "critical impeachment evidence that directly contradicted Plaintiffs' trial testimony, and their exclusion caused the rendition of an improper judgment, as evidenced by the jury's failure to attribute negligence to Dr. Banchs."

As with the alleged erroneous admission of evidence, the erroneous exclusion of evidence will support reversal only if the error probably resulted in the rendition of an improper judgment. *See Owens-Corning*, 972 S.W.2d at 43. To make this determination, a court must determine whether the excluded evidence was "crucial to a key issue" and, if so, reverse the judgment unless the evidence was cumulative or "the rest of the evidence was so one-sided that the error likely made no difference." *Id.*

The record reflects that Dr. Lee played the recordings for the court outside the presence of the jury so that the court could rule on the Hawkinses' objections to their admission. The Hawkinses objected to admission of the recordings on several bases: that they were protected by the attorney-client privilege, that the calls were made at the request of Dr. Lee's insurance carrier even though the carrier and Dr. Lee knew that the Hawkinses were represented by counsel, that the calls would be unduly prejudicial because a reference to the Hawkinses' insurance would be necessary to understand the calls' context, and that the statements therein were lay-witness opinions about medical standards of care and thus inadmissible on that issue. The trial court, in excluding the recordings, informed Dr. Lee that she could ask Gorostieta—who was the next witness to testify—about the substance of the phone conversations as long as the questions did not elicit anything about the Hawkinses' communications with their attorneys. However, Dr. Lee did not question Gorostieta about the calls.

15

Dr. Lee argued at trial, and reasserts on appeal, that the recordings were offered as proof of the previous subjective beliefs of the Hawkinses about the negligence or relative fault of Dr. Lee and Dr. Banchs, and to impeach their later blaming Dr. Lee more than Dr. Banchs for negligently causing Travis's stroke. However, a witness who is not a testifying expert cannot give opinion testimony unless it is "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." *See* Tex. R. Evid. 701. Standards of care for the health industry and whether conduct falls below those standards are not a matter of common knowledge about which a lay person would be competent to testify. *Rogers v. Crossroads Nursing Serv., Inc.*, 13 S.W.3d 417, 419 (Tex. App.—Corpus Christi–Edinburg [1st Dist.] 1999, no pet.); *see Tilotta v. Goodall*, 752 S.W.2d 160, 163 (Tex. App.—Houston [1st Dist.] 1988, writ denied) ("Lay witness testimony about negligence and proximate cause has no probative force in a medical malpractice action."). Moreover, were the Hawkinses competent to testify about the standard of care, the recordings would not have served as impeachment evidence because neither Travis nor Yolanda testified to any probative opinion about the applicable standards of care or whether either Dr. Lee or Dr. Banchs breached those standards. Ultimately, what Travis and Yolanda believed about the relative fault of Dr. Lee and Dr. Banchs was not probative of the fact questions for the jury—that is, their beliefs were not "crucial to a key issue," *see Owens-Corning*, 972 S.W.2d at 43—and thus, it was not reversible error for the trial court to exclude the recordings. We overrule Dr. Lee's third issue.

*Evidentiary sufficiency*

In her sixth issue, Dr. Lee argues that the evidence is legally and factually insufficient to support the jury's finding that she was negligent and that her negligence

16

proximately caused Travis's stroke. She also argues that the evidence is factually insufficient to support the jury's finding that Dr. Banchs was not negligent and its allocation of no fault to him for Travis's stroke.[4]

In reviewing for legal sufficiency, "we view the evidence in the light most favorable to the verdict, crediting favorable evidence when reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not." *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 794 (Tex. 2020). A party challenging the legal sufficiency of an adverse finding on which it did not bear the burden of proof at trial "must demonstrate on appeal that no evidence supports the adverse finding." *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). In reviewing for factual sufficiency, "we examine the entire record and consider and weigh all the evidence, both in support of and contrary to the challenged finding." *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). When a party attacks the factual sufficiency of an adverse finding on which it did not bear the burden of proof, we will set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). Under either standard, the trier of fact is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

---

[4] In the same issue, Dr. Lee also asserts that (1) the evidence "does not support the jury's damages awards" and (2) the trial court erred in "denying remittitur of excessive damages" because the evidence of damages is factually insufficient. However, she devotes only one paragraph to each of these arguments and cites nothing in the record to support the second; she has therefore waived the second argument due to inadequate briefing. *See* Tex. R. App. P. 38.1(i). For the first argument, the only evidence she cites are the exhibits we have already determined were properly admitted, arguing that they were not properly authenticated and thus erroneously admitted; we accordingly overrule that argument.

In citing evidence to support her argument, Dr. Lee focuses solely on her own testimony and that of her witnesses to demonstrate that she followed standard dental practices and fails to account for contradictory evidence that supports the verdict on negligence. For example, Dr. Byrne testified that Dr. Lee did not advise Travis to restart the Xarelto the night after the procedure, as she should have, and that Dr. Lee should have checked in with her patient the next morning to verify that there was no bleeding and to instruct him to resume the medication. Evidence showed that the first time there is any notation in Dr. Lee's records about when Travis should restart the Xarelto is from just before midnight on the Monday following the Friday procedure—after Dr. Lee testified that she already suspected Travis had suffered a stroke. In the notation, Dr. Lee says that Travis told her that Dr. Banchs had told him to restart the Xarelto when the bleeding stopped; yet Travis testified that he did not tell Dr. Lee that Dr. Banchs had told him when to resume the drug. Moreover, the only copy of the second medical-clearance form—about which the record is conflicting as to what Dr. Banchs wrote on it, if anything, as to when to restart the drug—went missing after Travis provided it to Dr. Lee's office. It was never scanned into Travis's medical record at Dr. Lee's office, despite that being the office's general practice, and no party was able to produce it in discovery.

Dr. Byrne unequivocally explained to the jury that it was Dr. Lee's duty to properly instruct Travis when to resume his Xarelto:

> And she [Dr. Lee] didn't tell him when to restart. She said if it – when it stops bleeding, and puts the onus on the patient's back and says, you determine when it stops bleeding and then you go back on. Well, that's not his job. It's her job to tell him . . . somebody had to give permission to restart. Not the patient, the dentist, who is the surgeon, and not the cardiologist.

18

Dr. Banchs likewise corroborated that the duty to instruct Travis to resume Xarelto was on the dentist, as the "proceduralist," and that the decision of when to restart medication should not be left to the patient. We conclude that legally and factually sufficient evidence supports the jury's finding that Dr. Lee was negligent.

As to proximate cause, both Dr. Byrne and Dr. Gregg Zoarski, M.D.—an interventional neuroradiologist—testified that had Travis been instructed by Dr. Lee to resume his Xarelto on Friday evening or Saturday morning after the procedure, he probably would not have suffered a stroke. Dr. Byrne explained the research showing that Xarelto resumes its anticoagulant effect and prevents strokes within thirteen hours after a dose is taken in a man of Travis's age. Thus, as Dr. Byrne explained, had Dr. Lee properly followed up with Travis to confirm there was no bleeding that Friday evening or the Saturday morning after the procedure, and instructed him to restart his Xarelto on either occasion, then the full effect of the medication would have been reached Saturday evening at the latest and would have prevented his stroke late Sunday night. Dr. Zoarski testified that Travis's being off his Xarelto "was the cause" of his stroke and that the stroke most likely would have been prevented had he resumed the medication Friday evening or Saturday morning.

Similarly, Dr. Kenneth Clyde Fischer, the plaintiffs' expert neurologist, testified that Travis's not restarting his Xarelto before Sunday, September 23, 2018, was the cause of his stroke. He explained that when a person has A-Fib, "there is a five to eightfold increased risk of stroke. That risk is reduced by medicines like Xarelto by 80 percent or more. If, however, the Xarelto is suspended, it has a relatively short half-life, and after a relatively short period of time, the benefit it has is gone." Dr. Fischer explained further that, during the four or five-day period when Travis was off his Xarelto, its anticoagulative effect "was gone, and the stroke occurred."

19

He opined that, "unquestionably, the cause of his stroke was the lack of Xarelto in that critical period of time." Like Dr. Byrne and Dr. Zoarski, Dr. Fischer testified that had Travis been instructed to resume taking his Xarelto the Friday evening or Saturday morning following the extraction, his stroke would have been prevented. Dr. Fischer confirmed that Xarelto has a "rapid onset of action" and provides a "protective value" within four hours of taking it and a "therapeutic level" within twelve to twenty-four hours.

Furthermore, although Dr. Lee cites discrete portions of the testimony of Dr. Jennifer Elizabeth Rasmussen-Winkler—the neurologist who performed a stroke consultation of Travis when he was in the hospital—to support her proximate-cause arguments, other portions of Dr. Rasmussen-Winkler's testimony unequivocally point to Travis's being off his medication too long as the cause of his stroke. For instance, to support her contention that proximate cause was not proven, Dr. Lee cites Dr. Rasmussen-Winkler's testimony that "the hypercoagulability risk" from being off Xarelto occurs at the 120th hour after being off the medication. Dr. Lee argues that Travis's stroke occurred before the 120th hour and therefore could not have been caused by his being off the Xarelto because until that hour, he had "normal coagulation factors." However, this argument both suffers from a factual flaw—Travis had indeed been off his medication for close to 120 hours when the stroke occurred because evidence showed his last dose had been taken on Tuesday night—and ignores other portions of Dr. Rasmussen-Winkler's testimony, in which she explained that (1) the 120th hour is merely the peak risk on a gradual bell curve with ever-increasing stroke risk for each hour after the last dose was taken; and (2) hypercoagulability was not the only risk factor for stroke in this case because Travis's A-Fib further increased the risk from his being off his medication. Furthermore, Dr. Rasmussen-Winkler answered "yes" to the question, "And are you essentially saying that Mr. Hawkins had a stroke as a result of

20

stopping Xarelto?" We conclude that the evidence is legally and factually sufficient to support the jury's finding that Dr. Lee's negligence was a proximate cause of Travis's stroke.

As to the jury's finding that Dr. Banchs was not negligent and its allocation of no fault to him, we conclude that there is factually sufficient evidence to support the finding. To support her argument on this issue, Dr. Lee cites the testimony of her expert, Dr. Joseph Boyle, DDS, who stated that it is reasonable and prudent for a dentist to rely on (a) the recommendation of a patient's treating cardiologist about when to stop and restart Xarelto and (b) her patient's following his medical providers' instructions. But even had the jury given weight and credibility to such testimony, that testimony was not inconsistent with Dr. Byrne's and Dr. Banchs's testimony that it was Dr. Lee's responsibility to confirm that Travis had stopped bleeding and had properly clotted before informing him to restart the Xarelto—which was the condition for restarting the Xarelto that Dr. Banchs testified he had notated on the second medical-clearance form and informed Travis about. The only cardiologist to testify about the standard of care for cardiologists was Dr. Banchs himself, and he testified that he had not breached any standard of care because the duty was on Dr. Lee as the surgeon to give Travis instructions regarding restarting Xarelto after the procedure. We cannot say that the jury's finding of no negligence on the part of Dr. Banchs was against the great weight and preponderance of the evidence, and we accordingly overrule Dr. Lee's sixth issue.

### Trial court's communications with the jury

In her first issue, Dr. Lee argues that the trial judge improperly announced to the jury that Dr. Banchs had settled with the plaintiffs and that such announcement harmed her by influencing the jury's allocation of fault. She contends that the judge's announcement that

21

Dr. Banchs had settled—which was "good news"—"created a substantial risk that the jury would adjust its findings on liability and damages." This, Dr. Lee further argues, led the jury to answer "No" to the question of whether Dr. Banchs's negligence proximately caused Travis's injury and likewise caused the jury to find that Dr. Banchs had no comparative responsibility for Travis's injury.

However, Dr. Lee did not preserve this alleged error because she did not object to the announcement or make a request for a limiting instruction at the time. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (acknowledging that party fails to preserve error about trial court's alleged improper conduct or comment if no contemporaneous objection is made unless such comment or conduct cannot be rendered harmless by proper instruction); *see also* Tex. R. App. P. 33.1(a)(2)(A) (error-preservation rule). When a party fails to make a timely objection and attempt to cure in response to a claimed error of this type at trial, such issues are reviewable on appeal only if the issue concerns "incurable error." *See Dow Chem.*, 46 S.W.3d at 241. The claimant bears the burden to explain how any comments made by the trial judge were incurable or would excuse the claimant's failure to preserve error. *Id.* Because a retraction or an instruction from the trial judge can generally cure any probable harm, there are only "rare instances" where "the probable harm or prejudice cannot be cured." *Standard Fire Ins. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979).

Specifically, informing a jury of a party's settlement is the type of error that courts have determined can be cured by an instruction to disregard. *See Salazar v. Payan*, 676 S.W.3d 752, 756 (Tex. App.—El Paso 2023, no pet); *Columbia Med. Ctr. of Las Colinas v. Bush ex rel. Bush*, 122 S.W.3d 835, 862 (Tex. App.—Fort Worth 2003, pet. denied); *Beutel v. Paul*, 741 S.W.2d 510, 513–14 (Tex. App.—Houston [14th Dist.] 1987, no writ). Dr. Lee has

22

not cited any applicable authority supporting her argument that the trial court's announcement to the jury about Dr. Banchs's settlement constituted incurable error. She needed, therefore, to object to the statement and request an instruction to cure. Because she did not, she has not preserved her first issue for our review.

In her fourth issue, Dr. Lee contends that the trial court's ex parte, private communication with the jury after dismissing one of the jurors on the first day of trial likely resulted in an unfair trial and "raised concerns about impartiality," which violated her due-process rights. She argues that such communication, combined with the trial judge's immediately preceding comments about his wife's being the victim of medical malpractice and his frustration with the jury, reflect judicial bias or at least the appearance of partiality. However, as with the previous issue, Dr. Lee did not object to the trial court's ex parte comments to the jury or request any limiting or curative instructions and therefore did not preserve the issue for review. *See Dow Chem.*, 46 S.W.3d at 241. She also has not cited any relevant legal authority for the proposition that a judge commits reversible error merely by talking to a jury outside the presence of counsel, or that a reviewing court is to presume anything other than that a sitting trial judge is being forthright about what has occurred in the jury room. *Cf. United States v. Gagnon*, 470 U.S. 522, 526 (1985) ("The mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right.").

Furthermore, to the extent that Dr. Lee argues the trial judge lacked impartiality or created an appearance of partiality by having the challenged private conversation just after making his comments about his family members' occupations and malpractice experience, allegedly as "reflected in subsequent discretionary rulings that disfavored Dr. Lee," we disagree. After reviewing the entire record, we fail to detect any improper judicial bias on the part of the

23

trial judge. *See Dow Chem.*, 46 S.W.3d at 240–41 (observing that to support challenge of bias or partiality, judge's comments must show "a deep seated favoritism or antagonism that would make fair judgment impossible"); *Holmes v. GMAC, Inc.*, 458 S.W.3d 85, 93 (Tex. App.—El Paso 2014, no pet.) (overruling argument that trial court's comments showed deep-seated antagonism or bias when considered in context in which they were made and entire record). We have concluded that the challenged evidentiary rulings were not an abuse of discretion and, when viewing the trial judge's summary of what he told the jury in its proper context, there is no record support for Dr. Lee's allegation of partiality or the appearance thereof. We overrule Dr. Lee's fourth issue.

### *Cumulative errors*

In her fifth issue, Dr. Lee contends that the above-discussed alleged errors by the trial court cumulatively resulted in an unfair trial and "undermined the integrity of the trial." She argues that even if the individual alleged errors are each deemed harmless, their "cumulative effect" deprived her of a fair trial and requires reversal. *See Owens-Corning Fiberglass Corp. v. Malone*, 916 S.W.2d 551, 570 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (Tex. 1998) ("Multiple errors, even if considered harmless taken separately, may result in reversal and remand for a new trial if the cumulative effect of such errors is harmful.").

However, we have determined that the trial court did not make the errors asserted and preserved by Dr. Lee and, therefore, there are no errors to cumulate. We overrule Dr. Lee's fifth issue.

**CONCLUSION**

Having overruled Dr. Lee's appellate issues that were properly preserved, we affirm the trial court's final judgment.

_____

Karin Crump, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed:   September 18, 2025